John G. Lonsdale and Another, Trustees of the St. Louis-San Francisco Railway Company, Appellants, *v.* James Speyer and Others, Defendants, Impleaded with Frederick Strauss and Others, Respondents. (Appeal No. 3.)

John G. Lonsdale and Another, Trustees of the St. Louis-San Francisco Railway Company, Appellants, *v.* James Speyer and Others, Defendants, Impleaded with Edward N. Brown, Respondent. (Appeal No. 4.)

John G. Lonsdale and Another, Trustees of the St. Louis-San Francisco Railway Company, Appellants, *v.* James Speyer and Others, Respondents, Impleaded with Others, Defendants. (Appeal No. 5.)

First Department, November 27, 1936.

*Edward S. Seidman* of counsel [*Frank A. Thompson, Robert G. Starr, Ivan H. Light* and *Aaron B. Coleman* with him on the brief; *Wollman & Wollman*, attorneys], for the appellants.

*John C. Higgins* of counsel [*Alfred Jaretzki, Jr., Walter C. Lundgren* and *William Piel, Jr.*, with him on the brief; *Sullivan & Cromwell*, attorneys], for the respondents Frederick Strauss, Robert V. White, Walter Seligman, Earle A. Bailie, Francis F. Randolph, Jefferson Seligman and John C. Jay.

*W. Morton Carden*, for the respondent Edward N. Brown.

*Henry W. Taft* of counsel [*Ralph Wolf, G. Forrest Butterworth, Jr., Edward A. Niles* and *Daniel E. Woodhull, Jr.*, with him on the brief; *Cadwalader, Wickersham & Taft*, attorneys], for the respondents Speyer & Co.

McAvoy, J.   The complaint which was held insufficient below alleges that plaintiffs were appointed trustees of the St. Louis-San

Francisco Railway Company by the United States District Court for the Eastern District of Missouri, Eastern Division, on October 28, 1933, and since that time have been acting as such trustees; that by an order of the same court, dated June 14, 1935, they were authorized and directed as such trustees to prosecute this action.

That the St. Louis-San Francisco Railway Company (hereinafter referred to as " the Frisco ") was organized on August 24, 1916, in the State of Missouri, and operated lines of railroads in the State of Missouri and in other western States and in southern States from November 1, 1916, until the appointment of a receiver for it and its property by the above-mentioned court.

That from August 24, 1916, until the appointment of a receiver, the Frisco had a place of business in New York, N. Y., where its board of directors and executive committee met and transacted business; that all the transactions and occurrences, hereinafter referred to, unless otherwise stated, took place in New York, N. Y.; that the partnership firm of Speyer & Co. and the partnership firm of J. & W. Seligman & Co. (hereinafter collectively referred to as " the bankers "), ever since the incorporation of the Frisco and during the life of its predecessor, St. Louis and San Francisco Railroad Company, were the bankers for said corporations and their " confidential and trusted advisers, agents and guides in all their financial matters, stock and bond transactions, and in the matter of the acquisition and sale of stocks and bonds and in the issue and sale of securities. In every way, during the times hereinafter mentioned, they had and bore the closest confidential and trust relations to and with the Frisco and its predecessor corporation and dominated and controlled the determination and administration of all the financial affairs and financial policy of the Frisco and its predecessor corporation, including the matter of the acquisition of stocks and bonds and the creation of stock and bond issues and the disposition of the same." The Frisco became and was the successor to and of the St. Louis and San Francisco Railroad Company (hereinafter referred to as " the railroad "), under and by virtue of its reorganization in 1916; that Speyer & Co. and Seligman & Co. were the reorganization managers of the railroad, and as such, " moulded the form and details of the reorganization and obtained full control of the Board of Directors of the Frisco at that time, and full control of the Frisco in all of its financial affairs and continued to act as such Reorganization Managers at all times hereinafter mentioned. As such Reorganization Managers, the bankers obtained controlling powers with reference to the Frisco and retained and exercised such powers during all the times hereinafter mentioned until the appointment of said receiver as aforesaid."

Speyer & Co. and Seligman & Co., having, during all the times herein set forth, the domination and control of the Frisco, had the power and the purpose to use the Frisco and its funds for their own benefit and gain, and did so as hereinafter stated.

That defendant Edward N. Brown has been a director of the Frisco since August 24, 1916, and chairman of the executive committee and of the board of directors of the Frisco since August 21, 1919, and at all times herein mentioned was under the domination and control of the bankers, and with the bankers was in full control of its financial affairs and transactions and financial policy; that the Frisco, trusting said bankers and said Brown, relied in every way upon the advice and guidance of the bankers and Brown in all its financial affairs; that in 1925 Speyer & Co. and Brown, then having the power, subject to the control and co-operation of Seligman & Co., to carry out whatever they desired with reference to the acquisition of stocks and the creation of stock and bond issues by the Frisco and the sale thereof, and with reference to the financial affairs and policy of the Frisco, and while occupying trust relationship to the Frisco, did secretly confederate and conspire together to use its funds and property and to manipulate its financial affairs for their own benefit, gain and profit, among other things, in order that Speyer & Co. might firmly entrench themselves as bankers for the Chicago, Rock Island and Pacific Railway Company (hereinafter referred to as " the Rock Island "), which would yield large profits and gains to Speyer & Co. and make large profits on shares of the common stock of the Rock Island which they then held and planned to acquire, and commissions on Rock Island stock to be acquired by the Frisco, and profits upon the purchase and sale of the common stock of the Frisco, which the bankers then held as such reorganization managers, and other profits, and in order that Brown might become chairman of the executive committee of the Rock Island at a large salary, and receive other benefits, all to the great damage and loss of the Frisco.

That pursuant to the confederation and conspiracy, Speyer & Co. and Brown did, for their own selfish purposes and to enable them to make gains and profits for themselves, wrongfully caused the Frisco, in or about 1926, to acquire for the purpose of having the Frisco keep the same permanently, 183,333 shares of the common stock of Rock Island and caused the Frisco to pay Speyer & Co. $10,506,090.40 therefor; that pursuant to the conspiracy, and as part of their scheme to profit at the expense of the Frisco, the bankers and Brown caused the Frisco to pay the bankers what they designated as " a special commission " of one dollar and twenty-five cents per share on the 183,333 shares of Rock Island stock; that this

183,333 block of Rock Island common stock was part of a block of 275,000 owned or purchased by Speyer & Co. pursuant to the conspiracy for the purpose of having the Frisco acquire and keep permanently the 183,333 shares, and with the intention and purpose of retaining the balance (91,667 shares) in order to make large profits for themselves thereon.

That by putting the stock in the hands of the Frisco and removing it from the active market, defendants were enabled to, and did, resell their 91,667 shares and other Rock Island common stock owned by them at that time or acquired by them during the conspiracy, at a profit of about $2,227,318.11, doing so pursuant to said conspiracy and using their said trust and financial relationship to the Frisco and their domination and control over it in order to make said profits.

That the bankers and Brown, in order to serve their selfish purposes, caused the Frisco to keep the 183,333 shares, with the result that the Rock Island, now being in bankruptcy, the Rock Island stock is practically worthless and the payment of said $10,506,090.40 to Speyer & Co. by Frisco resulted in a complete loss to it. That pursuant to the conspiracy, Speyer & Co. falsely represented to the Frisco that the 275,000 shares had cost them $15,384,153.47, and they falsely represented to the Frisco that they were transferring two-thirds of the 275,000 shares to the Frisco at the actual cost to them; that the 275,000 shares had cost Speyer & Co. (according to plaintiffs) about $15,351,125.97.

That Speyer & Co. represented to the Frisco that the 183,333 shares of Rock Island common stock acquired by the Frisco for $10,506,090.40 had been bought for the Frisco, although part of the shares were the property of Speyer & Co. which were secretly and without the knowledge of the Frisco included in the 183,333 shares, for which Speyer & Co. had paid about $45.98 per share, but that Speyer & Co. caused the Frisco to pay them $60.23 per share.

That before the consummation of the transactions, Seligman & Co. knowingly entered into and aided and abetted Speyer & Co. and Brown in the confederation and conspiracy and became a party thereto, and received a share of the gains and profits which came out of the transactions.

That prior to and at the time of the acquisition of the Rock Island stock, there was, and still is, in existence unsatisfied and unpaid a mortgage, which had been executed by the Frisco July 1, 1916, commonly called the " Prior Lien Mortgage," upon all the property of the Frisco, then owned by it, or to be thereafter acquired by it, to secure bonds to the amount of $250,000,000; that this mortgage provided that all stocks acquired by the Frisco after

that date must be delivered to the trustees under the mortgage. That Speyer & Co. and Brown knew, at the time they caused the Frisco to enter into the purchase of the Rock Island stock, that the Frisco was required to deliver the stock to the trustees under the mortgage as soon as it was received by the Frisco, and that it would become subject to the lien of the mortgage; that the bankers relied upon this fact as part of their conspiracy.

That Rock Island stock after its acquisition by the Frisco was delivered to the trustees under the mortgage by Brown and the officials of the Frisco, and is, therefore, by reason of the aforesaid acts of the defendants, not available to be tendered or delivered by the plaintiffs as such trustees to Speyer & Co. and Seligman & Co.

That Speyer & Co., Seligman & Co. and Brown by their acts have rendered it impossible for the Frisco or these plaintiffs to tender the 183,333 shares of Rock Island stock to Speyer & Co. and/or Seligman & Co., or deliver the same to Speyer & Co. and/or Seligman & Co.

That plaintiffs are entitled to rescind the transactions with reference to the acquisition of the Rock Island stock by Frisco and to a decree that plaintiffs shall recover from defendants the sum of $10,506,090.40, plus interest at the rate of six per cent per annum from January 26, 1926, less the dividends on the Rock Island stock which the Frisco has received, less the present value of the 183,333 shares, and to a decree for a full accounting by the defendants as trustees for Frisco for all profits and gains of every kind received by Speyer & Co., Seligman & Co. and Brown, or any of them, from, or because of, or growing out of the matters hereinbefore set forth.

That in January, 1926, Speyer & Co. and Seligman & Co., as reorganization managers and trustees of the Frisco, held in their hands in trust for the Frisco in excess of 50,000 shares of the common stock of the Frisco; that in pursuance of the conspiracy, the bankers sold 50,000 of the Frisco common stock to themselves for $4,762,500 and credited the amount to the Frisco in partial payment of the 183,333 shares of Rock Island common stock; that the price so credited was and was known and intended by the bankers to be less than the fair value of the 50,000 shares at that time, and this price was fixed upon by the bankers and Brown in order that the reorganization managers and trustees should make a profit for themselves, which they did, at the expense of the Frisco.

That pursuant to the conspiracy, Speyer & Co. and Seligman & Co. resold the 50,000 shares at a profit of about $346,105.06, and collected large sums in dividends on the stock after they acquired it.

That, in addition to the fraud perpetrated in the purchase of the 50,000 shares of Frisco common stock, it was agreed by Speyer & Co. and Seligman & Co. that one-half of any sum in excess of the par value obtained by them on the resale of the 50,000 shares should be paid or accounted for to themselves as trustees for the Frisco, but, although they resold the 50,000 shares for $108,605.06 in excess of the par value of the shares, they wrongfully concealed the fact from the Frisco and failed and still fail and refuse to account or pay over to the Frisco or plaintiffs the one-half of the amount in excess of the par value obtained by them on the resale.

That by causing the Frisco to acquire the 183,333 shares of Rock Island common, and in pursuance of the conspiracy, Speyer & Co. were enabled to become and became firmly entrenched as bankers for the Rock Island, and through such connection made large profits, and Brown became chairman of the executive committee of the Rock Island, with a salary of $50,000 per year.

That the transactions with reference to the acquisition of the Rock Island stock were perpetrated by means of a fraud upon the Frisco, and its stockholders and creditors, who were at all times ignorant of the facts constituting the fraud, and that such facts were not known until discovered by the plaintiffs as trustees as the result of proceedings instituted by them under the direction of the United States District Court in the year 1935, the Frisco being at all times under the domination and control of Speyer & Co., Seligman & Co., and Brown.

The prayer for relief asks a decree rescinding the transactions involving the acquisition of the 183,333 shares of Rock Island common stock by the Frisco; directing the defendants to pay to plaintiffs $10,506,090.40, plus interest at six per cent from January 26, 1926, less the amount of dividends received by the Frisco on the Rock Island stock and less the present value of the 183,333 shares of Rock Island stock. An accounting by the defendants is also asked for all profits and gains of every kind received by them or any of them from or because of, or growing out of the matters and things hereinbefore set forth, and for a full accounting by the defendants as trustees of and for the Frisco, etc.

Defendants constituting Speyer & Co. and defendant Brown moved for an order dismissing the complaint, under rule 106 of the Rules of Civil Practice, upon the ground that it did not state facts sufficient to constitute a cause of action.

The defendants constituting J. & W. Seligman & Co. moved for an order dismissing the complaint, or, in the alternative, for an order, pursuant to rule 102, directing that an amended complaint be served which does not attempt to state and improperly unite

inconsistent causes of action or claims. As to this alternative motion no ruling was made in the order since the complaint was dismissed. We have, therefore, no appeal from either a denial or an ignoring of this demand for relief and cannot as an appellate court consider its merits.

The motions of the defendants to dismiss were granted, with leave to serve an amended complaint within twenty days after the service of copies of the orders, with notices of entry thereof. The court below, in its opinion, indicated that its conclusion was reached because the rescission action lacked an allegation whether the defendants sold the stock to the Frisco, or whether they were merely agents of the Frisco in the purchase.

That there were no allegations of actual fraud in the transaction; that there was no showing of constructive fraud in the complaint; that there was an absence of allegations of fact showing the conspiracy and the fiduciary relationship; that there were no facts alleged showing domination and control.

That, in so far as an accounting was sought for the profits made on the Rock Island stock by the defendants, there was the same lack of allegations of fact to show the existence of a fiduciary relationship; that the claim for profits made on this stock is inconsistent with the claim for rescission of 183,333 shares transaction; that as to the accounting for profits made on the 50,000 shares of the Frisco stock, the complaint is defective, for the reason that no facts are alleged showing the trust relationship relied upon.

That as to the accounting for one-half of the excess of the par value of the 50,000 shares of Frisco, the complaint was defective in that the terms of the agreement and the parties thereto were not set forth; that there was no allegation that the said sum had not been " accounted for to themselves as trustees;" that this claim is inconsistent with the preceding claim which seeks to recover all of the profits made on the sale of the 50,000 shares. The court below also said that there were no allegations from which it can be inferred that the benefits accruing to the bankers or to Brown in themselves constituted either a fraud upon the Frisco or a diversion of benefits which might have been secured for the Frisco itself.

In determining whether the words used in a pleading constitute allegations of fact or conclusions of fact and not conclusions of law, it is proper to ascertain the meaning of the words used by consulting dictionaries of recognized standing. (*Kavanaugh* v. *Kavanaugh Knitting Co.*, 226 N. Y. 185, at p. 192.) The words " confidential and trusted advisers, agents and guides " are words in common use and are easily comprehended by any person of average intelligence

who understands English. These words show that the bankers stood in a fiduciary relation to the Frisco. They are allegations of fact; not conclusions of law.

When a fiduciary uses his power, not for the benefit of the *cestui que trust*, whose interests alone he should protect, but uses it for his own personal advantage and profit or for the advantage and profit of a third person, that constitutes a fraud and such conduct is enough to charge him with a duty to account. Therefore, it was not necessary for plaintiffs to allege actual fraud in the transaction.

It was not necessary to allege that the Frisco might have secured those benefits for itself, because all profits and every advantage beyond his lawful compensation which come to a fiduciary are for the benefit of his *cestui que trust.*

There is no question that defendant Brown was a fiduciary of the Frisco.

The complaint states that Speyer & Co. and Brown, " while occupying trust relationship to the Frisco, did secretly confederate and conspire together to use its funds and property and to manipulate its financial affairs for their own benefit." This is a sufficient statement of fact, or conclusion of fact of a conspiracy, considering the complaint in its entirety. There are sufficient conclusions of fact that before the consummation of the transactions, Seligman & Co. knowingly became a party to the conspiracy, aided Speyer & Co. and Brown therein and took part of the profits which came out of said transactions. One who co-operates with a fiduciary in his breach of duty becomes liable in every way as the fiduciary with whom he co-operates.

Even if Speyer & Co. and J. & W. Seligman & Co. had not been fiduciaries of the Frisco, and even if they had not been participants in the conspiracy, they are liable with Brown because they knowingly co-operated with him in his breaches of duty as a director.

The words " domination " and " control " as used in the complaint constituted a statement of facts and the legal relationship in question arose from those facts. These words do not stand alone in the complaint. They are used in connection with facts and acts specifically stated and are in their nature really conclusions of fact.

The prayer for relief is no part of the cause of action. It does not matter that the plaintiffs have asked for the wrong relief, or that they may not be entitled to all the relief they seek or to any of it or that it is inconsistent with the cause of action stated. If the complaint states a cause of action the relief to be awarded must be left to the trial court for determination. A plaintiff may include in his complaint allegations of fact in the alternative in stating his

cause of action, and upon the trial is entitled to obtain relief in accordance with his proof. In such a case a complaint is not subject to a motion to dismiss it for insufficiency.

Sufficient facts are alleged in the present complaint to set forth a good cause of action against all the respondents for rescission or an accounting for profits and losses.

The orders should be reversed, with twenty dollars costs and disbursements, and the motions denied, with leave to the defendants-respondents to answer within twenty days after service of order with notice of entry, upon payment of said costs.

MARTIN, P. J., O'MALLEY, TOWNLEY and DORE, JJ., concur.

Orders unanimously reversed, with twenty dollars costs and disbursements, and motions denied, with leave to the defendants-respondents to answer within twenty days after service of order upon payment of said costs.