119 F.2d 231 (1941)
In re THE VAN SWERINGEN COMPANY.
TERMINAL & SHAKER HEIGHTS REALTY COMPANY
v.
VAN SWERINGEN COMPANY.
In re THE VAN SWERINGEN CORPORATION.
THE TERMINAL & SHAKER HEIGHTS REALTY COMPANY
v.
THE VAN SWERINGEN CORPORATION et al.
In re THE VAN SWERINGEN CORPORATION and THE CLEVELAND TERMINALS BLDG. COMPANY.
THE TERMINAL & SHAKER HEIGHTS REALTY COMPANY
v.
THE CLEVELAND TERMINALS BLDG. COMPANY.
Nos. 8646, 8654, No. 8655.
Circuit Court of Appeals, Sixth Circuit.
April 16, 1941.
William H. Thompson, of Indianapolis, Ind., and Charles S. Wachner, of Cleveland, Ohio (Everett Warner, of Muncie, Ind., on the brief), for appellants.
Frederick L. Leckie and Joseph G. Fogg, both of Cleveland, Ohio (Arthur E. Petersilge and Kenneth Resseger, both of Cleveland, Ohio, on the brief), for Van Sweringen Corporation.
I. Walter Sharp and J. Hall Kellogg, both of Cleveland, Ohio, for Cleveland Terminals Bldg. Co.
Edward T. Butler, Jr., of Cleveland, Ohio, for Van Sweringen Company.
Joseph L. Stern, of Cleveland, Ohio (Meyer Abrams and Harry Myerson, both of Chicago, Ill., on the brief), for intervenors A. B. Gochenour and others.
Before ALLEN, HAMILTON, and MARTIN, Circuit Judges.
MARTIN, Circuit Judge.
In these three cases, which were argued together, The Terminal and Shaker Heights Realty Company (formerly Midamerica Corporation) has appealed from orders of the District Court in separate bankruptcy proceedings under former Section 77B, Bankr.Act, 11 U.S.C.A. § 207, in *232 which its large claims as a creditor of the three respective debtor corporations were allowed only for insignificant sums.
In No. 8646, In re The Van Sweringen Company, debtor, the claim of appellant for $8,177,023.99, on account of the debtor's notes held by it, was allowed in the sum of $1, with interest at 6 percent from October 1, 1935; In No. 8654, In re The Van Sweringen Corporation, debtor, the claim of appellant for $13,787,000, on account of that debtor's notes likewise held, was allowed in the sum of $887 and interest at 6 per cent from October 1, 1935; in No. 8655, In re The Van Sweringen Corporation, debtor, and The Cleveland Terminals Building Company, subsidiary debtor, the claim of appellant for $1,348,614.99, on account of bonds and interest thereon of the subsidiary debtor acquired by appellant, was allowed in the sum of $2, with interest at 6 percent from October 1, 1935.
The District Court found that the foregoing allowances were the amounts shown on the books of Midamerica Corporation as the purchase price of the notes and bonds of the respective debtors acquired by Midamerica at auction sale on September 30, 1935; that Midamerica Corporation was a combination in corporate form, participated in by directors of the respective debtor corporations, formed and utilized for the purpose, among other things, of divesting the debtor corporations of their properties or of obtaining claims against them at a sacrifice for the profit of the combination at the expense and to the detriment of the debtor corporations; that the debtor companies were insolvent on the date of the auction sale and could not meet their maturing obligations, their assets at a fair valuation not equalling their liabilities; that bad faith and breach of fiduciary duty were implicit in the purchases by the officers of the company of the corporate securities for their personal advantage; that the Midamerica Corporation acquired and holds the notes and bonds as trustee for the respective debtor corporations and that appellant, as its successor, is entitled to allowance of its respective claims only for the amounts paid for the same, together with interest thereon. We find that the record in each of the three cases abundantly supports these findings of the District Court.
The two Van Sweringen Brothers, big operators in corporate finance and industrial combination, expansion and control through the media of holding companies and interlocking directorates, were officers, directors and majority stockholders of the Vaness Company, a Delaware corporation which owned the majority of the capital stock, carrying voting control of the two debtor corporations, The Van Sweringen Company and the Van Sweringen Corporation, in which the brothers were also officers and directors. The debtor, The Van Sweringen Corporation, owned all the capital stock of the subsidiary debtor, The Cleveland Terminals Building Company, of which the Van Sweringens were likewise officers and directors.
The Vaness Company and the subsidiary debtor, The Cleveland Terminals Building Company, on October 31, 1930, borrowed on pledged securities an aggregate sum of $39,500,000 from the New York banking house of J. P. Morgan & Company. Notes were issued for the loans; and, subsequently $1,200,000 of second mortgage bonds of the subsidiary debtor found their way as collateral into the files of the New York Bankers. The Van Sweringen Brothers were endorsers of the notes and guarantors of the loans.
In May, 1935, the loans were defaulted; and, on September 13, 1935, J. P. Morgan & Company gave notice that the collateral securities fully listed in the notice would be sold at public auction on September 30, 1935. Earlier notice of the proposed sale had been given to the Van Sweringens, individually, but not to the corporate entities controlled by them.
Early in August, 1935, the brothers, O. P. Van Sweringen and M. J. Van Sweringen, began negotiations with G. A. Tomlinson and George A. Ball which resulted in the organization of Midamerica Corporation, the name of which was subsequently changed to The Terminal and Shaker Heights Realty Company (appellant herein). At that time, the Van Sweringen Brothers were in extreme need of financial assistance to conserve their individual pecuniary interests. Their attorney, J. P. Murphy, had drafted numerous tentative plans to relieve his clients from their endorsement of the Morgan held notes, namely that of the subsidiary debtor for $23,500,000 and that of the Vaness Company for $16,000,000, and at the same time to retain for the Van Sweringens control, direction and management of their industrial empire.
*233 Ultimately, there was a meeting of minds, evidenced in a formal letter, dated September 21, 1935, signed by Ball and Tomlinson and addressed to the Van Sweringen Brothers. It has been established that this letter was drafted by the Van Sweringens, or their attorneys. Among the stipulations in the letter, which became the contract between the parties, was a provision that Midamerica should bid at the advertised auction sale in accordance with the determination of its Board of Directors. It was provided that, for the first three years, the Board should be composed of six members, three of whom must be O. P. Van Sweringen, M. J. Van Sweringen, and Charles L. Bradley, their business associate. The other directors named were Ball, Tomlinson, and F. B. Barnard. Before the auction sale, the directors were elected as agreed, and O. P. Van Sweringen was also elected President, M. J. Van Sweringen, Vice-President, and Charles L. Bradley, Vice-President of the Midamerica Corporation.
The letter stipulated that Ball and Tomlinson would subscribe for $2,000,000 of preferred stock at par value and for 15,000 shares of common stock without par value at $1 per share. The Van Sweringens were granted a ten-year irrevocable option to acquire 55 percent of the common stock of the new corporation, representing voting control, in the manner carefully provided in Clause (3) of the letter proposal formally accepted by the Van Sweringens.
The opening paragraph of the letter read: "You have called to our attention an investment possibility in the proposed sale in New York of certain securities pledged to secure collateral notes of the Vaness Company and The Cleveland Terminals Building Company. The more important of these securities are those of companies created and developed under your control, direction, or management. These companies, in the main, prospered up to the time of the depression. We believe that under the same control, direction and management they will again prosper if the present improvement in business conditions shall continue, as we believe it will. If we did not so believe, we should not be interested in acquiring these securities, in whole or in part, under any circumstances. As it is, we should be interested if, but only if, we could be assured that you will participate actively in their direction and management."
The all important paragraph (3) of the contract-letter provided: "In furtherance of our desire for your active participation in the management and direction of the new corporation, we also desire that you become interested in the ownership of such corporation, and to this end we will, upon the issuance of these shares and upon the corporation having purchased at such sale either the securities described under Group 1 or Group 3 [which embraced all the securities involved herein] in the notice of said sale, deposit 8,250 shares of the common stock in escrow under an option agreement granting to you, and to the survivor of you, exclusively and without the right of assignment by you, the right to purchase such shares at our cost plus 5% interest per annum at any time after you shall have satisfied at least five of the six directors of such corporation that you (in keeping with your expressed desires) have paid or adjusted any and all claims based upon now existing commitments or relationships that may now be or hereafter become enforceable against you. The said option is to run for a period of ten years and be irrevocable, and during the life of such option you will have the sole and exclusive right to vote and represent such deposited common shares."
It is conceded in the record that "it was agreed and arranged with the Van Sweringens that by way of salary they were to have a drawing account of $100,000.00 per year" from the Midamerica Corporation.
Thus, as a result of their contract with Ball and Tomlinson, consummated by the aforementioned letter, the Van Sweringens, without investing a penny in Midamerica Corporation which purchased at the auction sale the notes and bonds of the debtors with which we are concerned, acquired voting control of Midamerica for a period of ten years and an option to buy 55 per cent of its stock for $8,250 plus five percent interest; and also assured themselves of an income, from the new corporation, of $100,000 per year for the ten-year period.
At the auction sale on September 30, 1935, Midamerica purchased in one lot, for the sum of $2,803,000, the securities described in the notice of sale as Group No. 1, which in parcel 18 embraced $270,000 of the second-mortgaged bonds of the subsidiary debtor involved herein, and in parcel 24 embraced the $13,787,000 amount *234 of notes of the Van Sweringen Corporation, and in another parcel embraced the notes of the Van Sweringen Company involved in this litigation.
At the same auction sale, Midamerica also purchased in one lot, for $318,000, the securities described in notice of sale as Group No. 3, which in parcel 51 embraced $930,000 of the second mortgage bonds of the subsidiary debtor with which we are concerned.
There were many valuable securities, stocks and bonds embraced in Groups 1 and 3, exclusive of the parcels covering the notes and bonds upon which the claims in this case are based. The record shows that Midamerica, by acquisition at the auction sale, invested the total sum of $3,121,000 in securities, whereof the listed securities alone had a market value of $5,745,219.63 on the date of purchase. This fact was used as apparent justification for the valuation on its books, by Midamerica, of its capital investment in the notes and bonds of the respective debtor and subsidiary debtor corporations in the respective, small, arbitrary amounts of $1, $2, and $887. But such consideration entered on its books as the cost price of the notes and bonds of the debtor and subsidiary debtor corporations did not, of course, even approximately measure their real value.
We think the District Court correctly held that "the Midamerica Corporation acquired and holds these notes, bonds and securities as trustee for the respective debtors whose obligations or assets they were," and that "the amounts paid for the notes and bonds measure the extent of its claims against these debtors."
From the manner and under the circumstances in which, in association with outside enterprisors, the Van Sweringens, as directors of insolvent corporations, purchased these claims against their cestui que trustent, the debtors, herein, at substantially less than real values, equity and good conscience demand that the claims of their corporate creature, Midamerica (predecessor to appellant), be limited to the amounts actually paid by it for the notes and bonds of the insolvent corporations. See, Bonney v. Tilley, 109 Cal. 346, 42 P. 439; In re McCrory Stores Corporation, D.C., 12 F.Supp. 267; Farwell v. Pyle-National Electric Headlight Co., 289 Ill. 157, 124 N.E. 449, 10 A.L.R. 363; Lingle v. National Insurance Co., 45 Mo. 109; Canton Roll & Machine Co. v. Rolling Mill Co., 4 Cir., 168 F. 465; Higgins v. Lansingh, 154 Ill. 301, 40 N.E. 362; Lonsdale v. Speyer, 1936, 249 App.Div. 133, 291 N.Y.S. 495; Lomita Land & Water Co. v. Robinson, 154 Cal. 36, 97 P. 10, 18 L.R.A.,N.S., 1106.
As expressed by Chief Judge Cardozo in Meinhard v. Salmon, 249 N.Y. 458, 464, 164 N.E. 545, 546, 62 A.L.R. 1: "Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the `disintegrating erosion' of particular exceptions. * * * Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court." We uphold the standard of this doctrine.
Recent reference was made to this opinion in Woods v. City National Bank & Trust Co., of Chicago, 61 S.Ct. 493, 85 L.Ed. ___, decided February 3, 1941.
It seems soundly settled that one who knowingly joins a fiduciary in purchasing for profit the property of the trust estate in unlawful circumstances becomes jointly and severally liable with him for resultant profits. Jackson v. Smith, 254 U.S. 586, 41 S.Ct. 200, 65 L.Ed. 418; Emery v. Parrott, 107 Mass. 95, 103; Zinc Carbonate Co. v. First National Bank, 103 Wis. 125, 134, 79 N.W. 229, 74 Am.St.Rep. 845.
In Magruder v. Drury, 235 U.S. 106, 119, 35 S.Ct. 77, 82, 59 L.Ed. 151, Mr. Justice Day, once a member of this court, said: "It is a well-settled rule that a trustee can make no profit out of his trust. The rule in such cases springs from his duty to protect the interests of the estate, and not to permit his personal interest to in any wise conflict with his duty in that respect. The intention is to provide against any possible selfish interest exercising an influence which can interfere with the faithful discharge of the duty which is owing in a fiduciary capacity."
*235 The evidence of manifest good faith of a director in dealing with his company revealed in Twin-Lick Oil Company v. Marbury, 91 U.S. 587, 23 L.Ed. 328, heavily depended upon by appellant, utterly distinguishes that case from the instant litigation. Moreover, the Supreme Court said (91 U.S. op. 588, 589, 23 L.Ed. 328): "That a director of a joint-stock corporation occupies one of those fiduciary relations where his dealings with the subject-matter of his trust or agency, and with the beneficiary or party whose interest is confided to his care, is viewed with jealousy by the courts, and may be set aside on slight grounds, is a doctrine founded on the soundest morality, and which has received the clearest recognition in this court and in others."
From the premise that the Twin-Lick Oil Company case, supra, establishes the right of a director to protect a validly acquired interest as against his corporation, appellant earnestly insists that it should prevail in these suits. We cannot concur. The mere fact that the Van Sweringens were endorsers and guarantors of heavy obligations of the corporations in which they were directors does not avoid the effect of the doctrine that they should not be permitted, directly or indirectly, to derive from their position personal profit or advantage not shared by all stockholders. See Thomas v. Matthews, 94 Ohio St. 32, 43, 113 N.E. 669, L.R.A. 1917A, 1068.
Geddes v. Anaconda Copper Mining Co., 254 U.S. 590, 599, 41 S.Ct. 209, 65 L.Ed. 425, consistently emphasized the application of the rule that the fiduciary relationship of directors to their corporations requires transactions between boards having common membership to be scrutinized as jealously as personal dealings between a director and his corporation, and held that where sales are involved the burden of showing full adequacy of consideration and entire fairness is placed upon those who would maintain rights arising from such transactions. This is especially true where a common director dominates the corporations. First Trust & Savings Bank v. Iowa-Wisconsin Bridge Co., 8 Cir., 98 F.2d 416.
Where the directors of a corporation, contrary to their fiduciary duty, have made a personal profit in their dealings with the corporation, equity will compel them to account to the corporation for such profits made at its expense. See Davis v. Pearce, 8 Cir., 30 F.2d 85, 88, and cases there cited. Also, to same effect, see Dunnett v. Arn, 10 Cir., 71 F.2d 912, 918, and authorities cited in footnote 5. The fact that the profits were realized by turning wheels within wheels, in the manner attempted in the instant case, does not detract from, but on the contrary adds force to, the doctrine. Nor does the intervention of dominated subsidiary corporations render the principle less effectual. Centmont Corporation v. Marsch, 1 Cir., 68 F.2d 460.
In conclusion, we find on the whole record that, in their transactions upon which the claims of appellant are based, the Van Sweringen Brothers cast the creature of their schemes, the Midamerica Corporation (in whose shoes appellant stands), within the inhibited area of bargaining, not conducted at arm's length as defined in Pepper v. Litton, 308 U.S. 295, 306, 307, 60 S.Ct. 238, 84 L.Ed. 281.
It is apparent here that the cupidity of persons in a fiduciary position has caused them to serve themselves in preference to those whom it was their duty to serve. Such dereliction is forbidden by just principles of law.
The decrees of the District Court in all three cases are in all respects affirmed.