**SUPERINTENDENT OF INSURANCE OF the STATE OF NEW YORK as Liquidator of Knickerbocker Insurance Company, Plaintiff,**

v.

**Jay M. FREEDMAN, James L. Hamilton, Mori Aaron, Schweitzer, Charles F. Raymond, Francis R. Salazar, Westland Minerals Corporation, and Petroleum Credit Corporation, Defendants.**

No. 74 Civ. 5686(GLG).

United States District Court, S. D. New York.

Dec. 13, 1977.

Regan, Goldfarb, Heller, Wetzler & Quinn, New York City, for plaintiff; Kenneth S. Knigin, Thomas A. Holman, New York City, of counsel.

Robert L. Kassel, New York City, for defendants; Anthony V. Labozzetta, New York City, of counsel.

## OPINION

GOETTEL, District Judge.

When Sir Walter Scott wrote "Oh what a tangled web we weave, when first we practice to deceive," he must have foreseen the Knickerbocker Insurance Company. The transactions that caused the demise of Knickerbocker, and which form the basis of this action, were indeed a tangled and fraudulent web, and they have made uncovering the facts of the company's downfall a most difficult task.

The New York Superintendent of Insurance brought this suit as the liquidator of Knickerbocker, alleging that the defendants conspired to and did defraud the company. Federal securities claims, as well as pendent state claims, are alleged. Specifically, the Superintendent asserts violations of section 10(b) of the Securities Exchange Act of 1934 (the 1934 Act), 15 U.S.C. § 78j(b), and section 12(2) of the Securities Act of 1933 (the 1933 Act), 15 U.S.C. § 77*l*. State claims are alleged under N.Y.Gen.Bus.Law § 352–c (McKinney 1968), and New York common law. The case was tried to the Court and the evidence revealed the following events.

### I. *Findings of Fact*

In the beginning of 1970, the Knickerbocker Insurance Company, a New York stock casualty company, was having difficulty meeting the capital requirements imposed by the New York State Insurance Department. The company was a wholly-owned subsidiary, and the chief asset, of Universal Knickerbocker Company ("Universal"), a publicly-held holding company. Universal was experiencing serious financial difficulty of its own. Both companies were controlled by Frederick Guminick, who has since sought solace in a foreign land and was not named in this action.

The Insurance Department conducted an investigation of Knickerbocker's capital structure. Knickerbocker retained the law firm of Milgrim Thomajon & Jacobs to represent it in the investigation. Robert Thomajon negotiated an agreement with the Superintendent allowing Knickerbocker several months to raise the necessary capital to satisfy the Department's regulations. Universal had made an attempt to supplement capital funds by floating a loan from a Canadian company called Scottish and York, and as security for the loan, Universal had pledged all of the stock of Knickerbocker. The loan came due in June and, if not met, would result in the loss of Knickerbocker to Scottish and York.

Throughout the spring of 1970, Universal continued to investigate potential sources for new financing, but by June, its efforts had been unavailing. Knickerbocker remained in difficulty under the Insurance Department's standards, and the company was directed to supplement its capital or undergo rehabilitation by the state. Unfortunately for Universal, this order occurred at the same time that the loan from Scottish and York was about to come due. Universal, therefore, faced the unhappy prospect of losing Knickerbocker, either to Scottish and York as the result of a default on the loan, or to the Insurance Department through a rehabilitation proceeding. Since Knickerbocker was the primary asset of Universal, its loss would have meant the certain collapse of Universal. New financing was desperately needed.

Defendant, Jay M. Freedman, the only defendant pursued in this action,[1] arrived on the scene sometime in June. He was apparently brought into the matter as a consultant to help Guminick and Universal in the search for fresh funds. Freedman's father, a prominent Chicago insurance executive, was the subject of early discussions as a potential source of money. It appears, however, that by mid-June, Freedman's father had decided not to get involved in any Knickerbocker rescue effort. As an alternative, Freedman suggested to Guminick the idea of talking to Francis Salazar of Denver, an attorney who represented various financial interests. Salazar allegedly put Guminick in touch with a flamboyant financier named James L. Hamilton. It is unclear when Hamilton first spoke to Guminick, but it is clear that Freedman knew Hamilton through previous dealings and had good reason to question Hamilton's business integrity.

Sometime around June 15, 1970, the directors of Knickerbocker who formed its Executive Committee, Guminick, Eugene Lieber and Leonard Lampert, held an emergency meeting. They discussed several options regarding potential sources for refinancing, but found them all equally unavailable. The minutes of the Executive Committee make it appear that on that date, the committee approved the purchase of 270,000 shares of Westland Minerals Corp. ("Westland") as an investment for the ailing Knickerbocker. There is, however, substantial reason to question whether such an authorization was actually made on that day. In fact, it appears that the minutes were drawn up later, as part of the screen for the scheme that was subsequently devised to save Universal from default on its loan from Scottish and York.

On June 26th, a shareholders' meeting of Universal was held at the office of Knickerbocker, and Mr. Freedman was present at the meeting. During the meeting, Guminick had several telephone conversations with Denver attorney Salazar. The evidence is unclear on when it was first suggested that Hamilton be contacted and brought into a rescue attempt. It is apparent, however, that a possible short-term solution for the Universal and Knickerbocker problems was devised by Guminick, Hamilton, Salazar and Freedman. The plan was to transfer a substantial amount of Knickerbocker's funds to the parent, Universal, so that Universal would not default on its loan from Scottish and York. With this immediate problem solved, Universal would be saved from collapse and could spend more time searching for a further infusion of new funds.

The screen for this transfer was the purported purchase by Knickerbocker of Westland stock. Immediately after the June 26th meeting, Freedman and Thomajon, the attorney for Knickerbocker, took a Knickerbocker check for $175,000, payable to Freedman, to Denver. In Denver, they met with Hamilton and Salazar. Freedman endorsed the check in blank and gave it to Hamilton, who then endorsed it and deposited most of it in a personal account in the First National Bank of Denver. Hamilton then withdrew $167,500 from a business account (James L. Hamilton and Associates) and wired it back to Universal's account in the Banker's Trust Company in New York City. With this new "financing," Universal was able to meet the payment of the Scottish and York loan and avoid the loss of its insurance company subsidiary.

No transfer of Westland stock, however, was made at this time, nor does it appear that one was intended. Schweitzer and Raymond, the alleged selling principals for Westland, did not appear at the Denver meeting of Hamilton, Salazar, Freedman and Thomajon. A second trip to Denver was made by Freedman and others in July, and at this time a certificate for Westland

---

1. The other defendants named in the complaint were either not served or not proceeded against by the Superintendent of Insurance. James Hamilton, Charles Raymond and Francis Salazar are currently in prison. Mori Schweitzer was also not proceeded against here, and the corporate defendants are apparently bankrupt and were also not seriously pursued by the plaintiff.

stock was produced. The certificate was for shares owned by Petroleum Credit Corp., a subsidiary of Westland, and, although not noted on the certificate, the shares were restricted, not tradeable, and had little market value.[2] (The sham nature of this purported securities transaction is also indicated by the fact that the date of transfer of the certificate was five days prior to the date of issue of the shares.) In any event, the Knickerbocker money was not directly used to pay for the Westland stock. Rather, it was "laundered" by the Denver transfers and returned to Universal in New York, with Hamilton keeping $7,500 of it as a "fee." It appears that in "exchange" for the Westland stock Universal placed some of its Knickerbocker shares in escrow with Salazar.[3]

In addition, Hamilton apparently agreed, as part of a long-range plan for Universal, to loan Universal $1,000,000. This loan was to be extended about one month after the Denver transaction. Hamilton's checks, however, were dishonored, and he failed to attend a meeting in New York at which some of the other principals were expecting him to make good on his promised loan. When the loan did not come through, Knickerbocker was thrown into receivership.[4]

Freedman's admitted involvement in these events is that he accompanied the Knickerbocker check to Denver after helping to bring Guminick, Hamilton and Salazar together; that he was present at the Denver bank when the check was deposited; that he returned to Denver for the second meeting concerning the supposed delivery of Westland stock; and that he attended the subsequent meeting in New York with Guminick, Salazar and others who were awaiting Hamilton's arrival with the $1,000,000 loan for Universal. At that meeting, on August 18, 1970, Knickerbocker paid Freedman $6,500 for his fees and expenses in connection with the Denver trips.[5] As stated above, the expected rescue by Hamilton, however, never materialized, and the group awaiting his arrival learned, to its substantial chagrin, that he had given them "The Sting" and disappeared from the Denver airport, adding salt to the wound by expropriating Salazar's limousine to facilitate his escape.

The Superintendent argues that Freedman was the "grease that turned the wheel of this conspiracy" to defraud Knickerbocker. In response to this troubling metaphor, Freedman contends that he was unaware that the check he took to Denver was part of a laundering operation intended to shift funds from Knickerbocker to Universal. He also maintains that he had no knowledge of the Westland "purchase" or the use of the purported securities transaction to mask the funneling of money from the subsidiary to the parent.

Based on the evidence presented at trial, however, the Court concludes that Freedman's denials are false. He made a number of statements at different times, some of them at a Department of Insurance hearing, that are inconsistent with his trial testimony. His explanation for these inconsistencies was unconvincing. His intimate involvement in the whole scheme, even to the point of having the Knickerbocker check for $175,000 made out to him, undercuts his assertion that he was unaware of what was occurring. Indeed, in his testimony at the Department's hearing, Freedman indicated knowledge that the money taken to Denver was to be used for "borrowing some stock, to assist in capitalizing." He

2. The New York Department of Insurance later gave a valuation of zero to the stock after a financial examination of Knickerbocker.

3. The shares were still in Salazar's control when he went to jail on other charges and Knickerbocker was in liquidation.

4. In August, 1970, by order of the Supreme Court in New York, the Superintendent was appointed rehabilitator of Knickerbocker and directed to take possession of the company's property. In November of 1971, the rehabilitation proceedings were terminated and Knickerbocker was adjudged insolvent, and the Superintendent was appointed liquidator of the company.

5. He loaned $2,000 of this back to Guminick personally.

also stated in his hearing testimony that he knew Westland stock was involved, since he had been so informed by an attorney representing Universal. Although he may not have alone turned the wheels of the conspiracy, he certainly played an integral role in the execution of the scheme. Freedman was not an unknowing dupe of the others. He was clearly a co-conspirator in the scheme to transfer Knickerbocker funds to its parent. At the very least, he aided and abetted Guminick and the others in carrying out the somewhat primitive misappropriation. The question remains, however, as to whether the claim against Freedman is properly framed and within the jurisdiction of this Court.

## II. *Liability Under Rule 10b–5*

The Superintendent argues first that Freedman is liable to Knickerbocker under section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. The Rule prohibits fraud "in connection with the purchase or sale of any security." Under the Superintendent's theory, Freedman participated in the "securities" transaction by which the company was defrauded of $175,000. There are several problems with this theory, however, sufficient to make a finding of liability under Rule 10b–5 unfounded in this case.

■ It is undisputed that the Superintendent may sue on behalf of Knickerbocker as the liquidator of the company, and that a corporation that is a party to a securities transaction is protected by the Rule. *See Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 10, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); *Hooper v. Mountain States Securities Corp.*, 282 F.2d 195 (5th Cir. 1960), *cert. denied*, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961). This general proposition is limited by the requirement that a plaintiff under the Rule must be either a purchaser or seller of securities to have standing to sue. *Blue Chip Stamps v. Manor Drugs Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *Birnbaum v. Newport Steel Corp.*,

193 F.2d 461 (2d Cir.), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952).

■ The immediate problem with the Superintendent's theory in the instant case is that Knickerbocker was not a purchaser of securities. No *purchase* of the Westland stock for $175,000 was ever intended, and none took place. The money that is alleged to have been authorized as payment for the Westland stock was simply misappropriated by Guminick and the others and diverted to Universal, and it is clear that no real purchase of securities was ever effected. Before trial, the Superintendent proceeded on the theory that Knickerbocker had been fraudulently induced to buy worthless securities, but after presentation of all the evidence, it is apparent that no such purchase occurred. Under these circumstances, Knickerbocker was not a purchaser within the meaning of the Rule and does not have standing to assert a 10b–5 violation. *Blue Chip Stamps, supra.*

The plaintiff pursues his theory, however, and contends that *Bankers Life & Casualty, supra*, supports his argument for 10b–5 liability in this case. In *Bankers Life*, the Supreme Court broadly interpreted the "in connection with" requirement of the Rule and held that any fraud "touching" a purchase or sale was sufficiently connected to the transaction to support liability. 404 U.S. at 12–13, 92 S.Ct. 165. In that case, however, there was never any question that several securities transactions had occurred through which a fraud had been perpetrated. The Court held only that the fraud alleged there was sufficiently related to those securities transactions to come within the Rule. The Supreme Court's opinion does not remove the need for some securities transaction to support liability, and does not specifically relate to the subsequent upholding of the purchaser-seller requirement in *Blue Chip Stamps*. Without a securities transaction, the federal interest in the regulation of the securities markets reflected in Rule 10b–5 does not arise.

On the other hand it is clear that the "transfer" of the Westland stock was at least related to the transfer of funds and,

indeed, was the cover for it. Whether this can be considered a sufficient relationship to invoke the *Bankers Life & Casualty* rule is a novel question. Since no real purchase was ever intended to be made, however, the corporation's status as a purchaser within the Rule is doubtful.

In addition to this standing defect, the Superintendent's 10b–5 theory is questionable on another ground. The evidence did not show that anyone protected by the Rule was deceived by anything the defendant and his co-conspirators did. Even if there had been a fraudulent securities transaction, all the participants knew exactly what was occurring and none was in any way misled.

■■■ As stated recently by the Second Circuit, the general problem in the application of Rule 10b–5 to derivative actions on behalf of corporate purchasers or sellers "has lain in the degree to which the knowledge of officers and directors must be attributed to the corporation, thereby negating the element of deception." *Goldberg v. Meridor*, 567 F.2d 209 at 215 (2d Cir. 1977). Because it is now clear that a breach of fiduciary duties, without deception, misrepresentation or nondisclosure, does not come within the Rule, *Sante Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), it is necessary for a plaintiff asserting a corporation's rights to show that the "corporation," as such, was deceived. Normally, this showing would be made by proof that some or all of the corporation's directors were deceived, either by inside or outside defendants. *See Ruckle v. Roto American Corp.*, 339 F.2d 24 (2d Cir. 1964).

The development of the Rule's application, however, has gone further than this,

and it has been interpreted to protect minority interests in corporations whose directors have a conflict of interest in a challenged transaction. *See, e. g., Goldberg v. Meridor, supra; Schoenbaum v. Firstbrook*, 405 F.2d 215 (2d Cir. 1968) (en banc), *cert. denied*, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); *Pappas v. Moss*, 393 F.2d 865 (3d Cir. 1968). *See Wright v. Heizer Corp.*, 560 F.2d 236 (7th Cir. June 30, 1977). As Judge Friendly explained in *Meridor*,

> "there is deception of the corporation (in effect, of its minority shareholders) when the corporation is influenced by its controlling shareholder to engage in a transaction adverse to the corporation's interests (in effect, the minority shareholders' interests) and there is nondisclosure or misleading disclosure as to the material facts of the transaction."

567 F.2d at 209.

■■ Assuming that a securities purchase had occurred in this case, the Superintendent proceeded on the theory that Guminick, Freedman and others had "deceived" the corporation by failing to disclose that the Westland stock was restricted and therefore valueless. The evidence disclosed, however, that none of the other Knickerbocker principals was in fact deceived. The Court concludes that the members of the Executive Committee of Knickerbocker were not deceived by Guminick's scheme.[6] Moreover, there is no evidence to support a conclusion that any other directors of Knickerbocker were misled or deceived by Guminick and his co-conspirators. No director of Knickerbocker, therefore, was a victim of the fraud.

Further, even under the conflict of interest theory of *Meridor, supra*, there was no minority interest in Knickerbocker that could have been deceived by the transac-

---

**6.** The only testimony supporting an inference of deception of the Executive Committee was that of Eugene Lieber, a member of that committee. Lieber was also president of Knickerbocker and vice-president of Universal. At trial, his testimony was vague and essentially unconvincing. He did not testify that Guminick told the committee that the Westland stock was unrestricted and freely tradeable. What emerged from his testimony, however, was a

clear picture that Lieber consciously left Guminick on his own in carrying out the rescue transaction. While it may be that Lieber did not know all of the details of Guminick's plan, it is equally clear that Lieber did not wish to know and intentionally did not become involved directly in the transaction. Under these circumstances, the Court cannot conclude that Lieber was deceived in any real sense.

tion. Universal was the sole shareholder of Knickerbocker, and it not only suffered no deception, it was the ultimate beneficiary of the transaction, since it received the money after the laundering operation in Denver. Therefore, the cases holding that inside directors may be liable under the Rule for failing to disclose material factors to minority shareholders are inapposite. *See, e. g., Goldberg v. Meridor, supra; Wright v. Heizer Corp., supra.* Because there was no fraud against either directors or minority shareholders, no 10b–5 liability lies on behalf of the corporation.

The only persons injured and deceived by this transaction were the policy holders and creditors of Knickerbocker. Through the mechanism of the liquidator suit, the Superintendent represents their interests here as well as the interests of the public. There is no authority, however, for the proposition that these interests are directly protected by Rule 10b–5. In *Bailes v. Colonial Press, Inc.,* 444 F.2d 1241 (5th Cir. 1971), the Fifth Circuit held that even if all directors and shareholders of a corporation are privy to the fraud, a derivative claim under the Rule may arise on behalf of the corporation if the participants intended to defraud future shareholders or creditors. The *Bailes* holding was recently reaffirmed by that court in *Miller v. San Sebastian Gold Mines, Inc.,* 540 F.2d 807 (5th Cir. 1976). To the extent that these cases hold that a "deception" can occur when all persons in the corporation knowingly act to defraud future creditors or shareholders, they are inconsistent with the Second Circuit's analysis of derivative 10b–5 claims which requires the deception of a present minority interest. *See* R. Jennings & H. Marsh, *Securities Regulation* 999 (1977). In any event, the *Bailes* theory has been used by the Fifth Circuit only in the context of fraud perpetrated by promoters of a corporation that quite clearly affects investors who later buy shares in the corporation. As such, the protection afforded by the Rule, a protection intended to ensure full and fair disclosure to the investing public, is at least arguably furthered by the application of the Rule in that situation. *But see Kremer v. Selheimer,* 215 F.Supp. 549 (E.D.Pa.1963).

■ It should be remembered, however, that the private cause of action under the Rule is a judicial creation that was implied notwithstanding the existence of private actions explicitly provided by other sections of the 1933 and 1934 Acts.[7] The Rule should not be applied automatically to every allegedly fraudulent transaction arguably involving securities. Certainly, the private cause of action under the Rule should not be extended to include within its proscription frauds which do not injure any public investors nor any purchasers or sellers of securities. Such extensions are not justified by the legislative purpose of federal securities regulation. *Cf. Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 97 S.Ct. 926 (1977). While there is no question that Rule 10b–5 should be read "flexibly not technically and restrictively," *Bankers Life & Casualty,* 404 U.S. at 12, 92 S.Ct. 165, such an instruction cannot be the basis for extending the reach of the Rule to simple corporate misappropriation having no appreciable detrimental effect on securities investors. *Cf. Sante Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. at 1303, 51 L.Ed.2d 480.

In the instant case, no fraud was practiced on public investors, and the degree to which the fraud was related to a securities transaction at all is minimal at best. No component of the Knickerbocker corporation—directors or shareholders—was deceived or injured by the fraudulent diverting of funds to Universal. Under these circumstances, there is no basis for liability under Rule 10b–5.

### III. *Liability Under Section 12(2)*

■ Although the plaintiff did not plead such a violation in his complaint, he now asserts, for the first time, a theory of

---

7. *See, e. g.,* 1933 Act, §§ 11, 12, 13, 15, 15 U.S.C. §§ 77k, 77*l*, 77m, 77*o*; 1934 Act, §§ 9, 16, 18, 15 U.S.C. §§ 78i, 78p, 78r.

liability under section 12(2) of the 1933 Act, 15 U.S.C. § 77*l*. Even if the Court considered this an implicit amendment of the complaint to conform to the proof under Fed.R.Civ.P. 15(b), and also held that it related back to the time of the original complaint under Fed.R.Civ.P. 15(c), the claim would undoubtedly be barred by the applicable statute of limitations in section 13 of the 1933 Act, 15 U.S.C. § 77m. There is no proof in the record showing that the plaintiff did not discover the fraud prior to one year before the complaint was filed, as required by section 13.

■ Moreover, this attempt by the Superintendent to salvage some federal cause of action from the confusing proof in this case portrays plaintiff's own inability to comprehend the federal securities laws. If the 12(2) claim had been validly asserted, it nonetheless would fail for reasons similar to those discussed *supra* under 10b–5 theory. First, there was no real purchase or sale, or offer to purchase or sell, a security as required by the statute. Second, there was no deception, and section 12(2), by its terms, does not create liability when "the purchaser [knows] of such untruth or omission." It may be true that under section 12(2) the scienter and reliance requirements are not as stringent as they are under Rule 10b–5. *See Johns Hopkins University v. Hutton*, 422 F.2d 1124 (4th Cir. 1970); *Thiele v. Shields*, 131 F.Supp. 416 (S.D.N.Y.1955), but these differences do not make section 12(2) applicable to non-securities transactions where no purchaser was deceived by the acts of a defendant. For these reasons, there can be no liability under section 12(2).

## IV. *State Law Claims*

■ The Superintendent also asserts claims against Freedman based on New York law. The Court has jurisdiction to decide these pendent claims under *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Defendant argues that the Court should decline to determine these claims since no federal claim has been proven. After trial, however, with the litigation over, the Court sees no reason why in the interests of judicial economy it should not proceed to decide the pendent claims arising out of the same transaction challenged under federal law, particularly where the federal claims are neither spurious nor insubstantial. *See, e. g., Brunswick v. Regent*, 463 F.2d 1205 (5th Cir. 1972); *Bowman v. Hartig*, 334 F.Supp. 1323 (S.D.N.Y.1971).

The state claims arise under common law and section 352–c of New York General Business Law, a securities anti-fraud statute.[8]

■ It is clear that section 352–c provides a private cause of action for a defrauded purchaser in a securities transaction, *Barnes v. Peat Marwick Mitchell & Co.*, 69 Misc.2d 1068, 332 N.Y.S.2d 281 (Sup. Ct.1972), *modified*, 42 A.D.2d 15, 344 N.Y. S.2d 645 (1st Dep't 1973), but the Superintendent has not offered any authority for the proposition that the state law is in any way broader than Rule 10b–5, or that it proscribes the non-securities related fraud in the instant case. Nonetheless, the Court

---

**8.** N.Y.Gen.Bus.Law § 352–c (McKinney 1968) provides in part:

1. It shall be illegal and prohibited for any person, partnership, corporation, company, trust or association, or any agent or employee thereof, to use or employ any of the following acts or practices:

   (a) Any fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale;

   (b) Any promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances;

   (c) Any representation or statement which is false, where the person who made such representation or statement: (i) knew the truth; or (ii) with reasonable effort could have known the truth; or (iii) made no reasonable effort to ascertain the truth; or (iv) did not have knowledge concerning the representation or statement made; where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of any securities or commodities, as defined in section three hundred fifty-two of this article, regardless of whether issuance, distribution, exchange, sale, negotiation or purchase resulted.

need not investigate this issue, because it finds the defendant liable under principles of New York common law.

■ It is a beginning assumption of state law that a corporate director has a fiduciary duty to manage the corporate assets in a reasonable way, and that he is liable for any waste or misappropriation of corporate property. *See Rapoport v. Schneider*, 29 N.Y.2d 396, 328 N.Y.S.2d 431, 278 N.E.2d 642 (1972). New York has embodied these fiduciary principles in section 720 of the Business Corporation Law (McKinney 1963). That section states that an "action may be brought against one or more directors of a corporation to procure a judgment" for violations of fiduciary duties. In the instant case, Guminick would certainly be liable to the plaintiff for misappropriating $175,000 of Knickerbocker funds and funneling them to its parent. Knickerbocker received nothing in return for its money, and the damage to the corporation, its creditors and policy holders, is manifest.

■ It should be noted initially that the statutory embodiment of fiduciary principles in section 720 is explicitly an extension of the common law and not a limit on it. *See id.* § 720(c); *Rapoport v. Schneider, supra.* Freedman was a co-conspirator of Guminick, but was not himself a director. Accordingly, under general principles of common law liability, the Court finds that Freedman is liable as a co-conspirator in the misappropriation.

The common law liability of a co-conspirator who aids a director to breach his fiduciary duties is not a new development in New York. In *Gray v. Fuller*, 17 App.Div. 29, 34, 44 N.Y.S. 883, 886 (4th Dep't 1897), the court approved joining directors with third-party co-conspirators as defendants in an action for corporate waste:

"It is well settled that in case the directors of a corporation combine with others to defraud a shareholder of his interest in the corporation, by acts of spoilation, such conduct is actionable, and all persons so combining may be made parties defendant in an equitable action brought by the shareholder to restrain the consummation of the wrong, and recover the damages occasioned by the acts."

This rule has been consistently reaffirmed by the New York courts. *Binon v. Boel*, 271 App.Div. 505, 510, 66 N.Y.S.2d 425, 429 (1st Dep't 1946), *aff'd*, 297 N.Y. 528, 74 N.E.2d 466 (1947) ("those who conspire with and induce directors to breach their fiduciary duties are liable for any damages which ensue."); *Lonsdale v. Speyer*, 249 App.Div. 133, 141, 291 N.Y.S. 495, 504–05 (1st Dep't 1936) ("one who co-operates with a fiduciary in his breach of duty becomes liable in every way as the fiduciary with whom he co-operates."); *Goodman v. Goodman & Suss Clothes Corp.*, 68 N.Y.S.2d 281 (Sup.Ct.1947). Since the Court has found that Freedman was a willing and knowing participant in the conspiracy to divert Knickerbocker funds to Universal, he is liable as such a co-conspirator.[9]

■ In addition, under New York law it is clear that the liability of such directors and co-conspirators is joint and several, notwithstanding the amount of any direct benefit conferred upon them through the fraudulent transaction. *Munzer v. Blaisdell*, 183 Misc. 777, 49 N.Y.S.2d 919 (Sup.Ct. 1944), *modified*, 269 App.Div. 970, 58 N.Y. S.2d 360 (1st Dep't 1945); *Ballantine v. Ferretti*, 28 N.Y.S.2d 668 (Sup.Ct.1941). *See Lonsdale v. Speyer, supra.* Freedman, therefore, is liable as a fiduciary would be for the misappropriation of Knickerbocker funds as well as any "fee" that he received for his part in the transaction. Although Freedman may not have been the primary force in devising this conspiracy, as a knowing participant, he nonetheless is as culpa-

---

9. In New York, a civil conspiracy has been defined as "an agreement or confederation between two or more persons intentionally participating in the furtherance of a preconceived common plan or purpose to defraud." *Vom*

*Lehn v. Astor Art Galleries, Ltd.*, 86 Misc. 2d 1, 7, 380 N.Y.S.2d 532, 538 (Sup.Ct.1976). *See also Green v. Davies*, 182 N.Y. 499, 75 N.E. 536 (1905).

ble as each of the others who knowingly took part in the misappropriation. Like any co-conspirator, he is jointly and severally liable for the loss to the corporation resulting from the fraudulent scheme.

## V. *Conclusion*

This case displays quite well the limitations of federal securities regulation as a tool for redress of essentially state law violations. Recently, the Supreme Court has begun to exhibit a healthy skepticism of assertions that corporate mismanagement and waste should automatically come within federal proscriptions of securities fraud. *See, e. g., Sante Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). In trying to conform the contours of judicially implied liability under Rule 10b–5 to the purpose of the federal legislation, the Court has concluded that, in some situations, petitioners complaining of breaches of fiduciary duties should be relegated to state law remedies. This case demonstrates that such a directive is not necessarily ineffective.

As the Court stated in *Cort v. Ash,* 422 U.S. 66, 84, 95 S.Ct. 2080, 2091, 45 L.Ed.2d 26 (1974), "[c]orporations are creatures of state law, and investors commit their funds to corporate directors on the understanding that, except where federal law expressly requires certain responsibilities of directors with respect to stockholders, state law will govern the internal affairs of the corporation." Of course, this recognition that federal law is not totally inclusive does not weaken the specific proscriptions of the securities acts which mandate full and fair disclosure to securities investors. It is, however, a realization that present federal law cannot be interpreted in a principled way to usurp all of state corporation law. *See generally* Cary, *Federalism and Corporate Law: Reflections Upon Delaware,* 88 Yale L.J. 663 (1974). A tortured construction of federal statutes is not a proper way to federalize the law of corporate management. Moreover, as is apparent from this case, state remedies are not necessarily inadequate to redress complaints falling outside of the scope of federal law.

This opinion shall constitute the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

The plaintiff will settle a judgment on notice.

SO ORDERED.