Perry O. HOOPER, as Trustee in Bankruptcy of Consolidated American Industries, Inc., Appellant,

v.

MOUNTAIN STATES SECURITIES CORPORATION et al., Appellees.

No. 18218.

United States Court of Appeals Fifth Circuit.

July 12, 1960.

Rehearings Denied Sept. 26, 1960.

Albert W. Copeland, Montgomery, Ala. (Godbold, Hobbs & Copeland, Montgomery, Ala., of counsel), for appellant.

J. Asa Rountree, III, Birmingham, Ala., Jack Crenshaw, Montgomery, Ala., Jos. F. Johnston, James C. Barton, Birmingham, Ala., Thomas G. Meeker, Gen. Counsel, S. E. C., David Ferber, John A. Dudley, Attys., S. E. C., Washington, D. C. (Cabaniss & Johnston, Deramus, Fitts & Johnston, Birmingham, Ala., of counsel), for appellees.

Before RIVES, Chief Judge, and CAMERON and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

In this civil action seeking relief for violation of § 10(b) of the Securities Exchange Act, 15 U.S.C.A. §§ 78 et seq., 78j, and Rule X–10B–5 promulgated by the SEC, the principal question is whether a corporation misled by fraud in the issuance of its stock in return for spurious assets is a seller. Is the transaction a sale? The District Court on motion to dismiss the complaint thought not. With that conclusion, the efforts to secure extraterritorial service of process under § 27 of the Act for the trial in Alabama over defendants residing in other states automatically fell. Some subsidiary questions exist. These include the right of the bankruptcy Trustee to sue for fraud perpetrated on the corporate bankrupt and also the problem of applicable statutes of limitation. Faced also is a question whether the scheme was so neatly executed that there was no "seller" and no "purchaser." This is so, the argument runs, because although the issuing corporation parted with its shares, this was done through persons having no authority (hence not a "seller") and the acquiring corporation was liquidated prior to receiving the

stock (hence not a "purchaser"). We hold the corporate issuer to be a seller and reverse.

## I.

### The Fraudulent Scheme.

■ Because the basic issue is broadly presented, we may capsulate the facts alleged which, for this motion, are deemed established. In doing so, however, we would emphasize that the complaint more than satisfied the requirements of the Federal Rules.[1] In its fourteen pages and the annexed five exhibits making up another ten pages, it sets forth in detail reminiscent of common law pleading names, places, dates and specific transactions. The sufficiency of the allegations of fraud under F.R.Civ.P. 9, 28 U.S.C.A. is not challenged.

Plaintiff is the Trustee of Consolidated American Industries, Inc. The corporation had been under the domination of the somewhat renowned BenJack Cage, now a Brazilian protected fugitive from Texas justice. On October 18, 1956, control of Consolidated passed into new hands located in Alabama. As a condition Cage was required to sever all connections with the affairs of Consolidated. This he formally did. But that is all, for he then became the central figure in a fraudulent scheme concocted with the other defendants to get Consolidated to issue 700,000 shares of its stock (par value 1¢ but having a current trading value of $1.00). Ostensibly leaving Consolidated, Cage went to Cuba where on behalf of another Cage enterprise (I.C.T.) he orally agreed to buy shares in a Cuban insurance company. This called for a down payment of $5,000 and an advance to the Cuban company of an additional $5,000 as a demand loan. This $10,000, although not then paid to the Cubans, cuts an important figure in this litigation. Winging his way back to Texas where he was then still a free man,

Cage made another deal through a Corpus Christi trader to acquire oil exploration rights in Honduras.

The grand aim of Cage was to find a corporate vehicle through which these two contract rights could then be transferred to Consolidated in exchange for Consolidated stock which would thereafter be distributed in liquidation of the vehicle corporation. The Consolidated stock could then be disposed of by the individual distributees as regulation-free stock in ordinary over-the-counter operations. Here is where the defendant Mountain States Securities Corporation and the Denver individual defendants come in. This corporation in connivance with certain directors, stockholders and its counsel created Mid-Atlantic Development Company which was to serve as the vehicle corporation. The stock ownership of Mid-Atlantic was ultimately fixed at 4/7ths for Cage (or his nominees) and 3/7ths for the Denver group.

In the meantime, around November 15, 1956, in order to get I.C.T. to transfer to Mid-Atlantic the rights to the Cuban insurance company stock, Cage had to scrape up $10,000 to comply with the initial Cuban deal. He did this by falsely representing to the new Alabama management of Consolidated then located in Montgomery, Alabama, that Consolidated already owned the Cuban insurance company stock, and that the Cuban company was in dire need of financing which, if not forthcoming from Consolidated, would result in loss of its investment. This took place by use of interstate long distance telephone facilities. This call was effective and Consolidated thereupon arranged for the $10,000 to be sent to Cuba.

Mid-Atlantic, now the owner of the rights to procure the Cuban insurance company stock and the Honduran ex-

---

1. Conley v. Gibson, 1957, 355 U.S. 41, 47–48, 78 S.Ct. 99, 2 L.Ed.2d 80, 85–86; Millet v. Godchaux Sugars, 5 Cir., 1957, 241 F.2d 264; Carss v. Outboard Marine Corp., 5 Cir., 1958, 252 F.2d 690.

ploration rights, formally contracted to transfer these to Consolidated in exchange for 700,000 shares of Consolidated stock. But as the new post-October Alabama management of Consolidated was not in on the deal, some way had to be found to get the Consolidated's New York City stock transfer agent to issue the 700,000 shares to Mid-Atlantic. Here is where the Pennsylvania defendant, the former secretary of Consolidated, and the New York defendant, its former general counsel, come in. In December 1956 the former secretary falsely certified corporate resolutions purporting to approve as of October 18, 1956, the Mid-Atlantic transaction. The former general counsel falsely wrote a letter to the transfer agent concerning the Board of Directors' action in this transaction and stating his opinion that the issuance was exempt from SEC registration. At the time these actions were taken, each knew that he was no longer an officer of Consolidated, lacked authority to act in behalf of the corporation, and that the transaction was not as represented to the transfer agent. The transfer agent, acting pursuant to these corporate directions, issued the stock in Mid-Atlantic's name and delivered the certificate to the former general counsel who in turn gave it to Cage. Mid-Atlantic had already been dissolved and new stock was issued in the name of the distributees (or nominees) of Mid-Atlantic. Of the 700,-000 shares, over 400,000 were then sold by the distributees to individual investors throughout the world.

Accepting these allegations as sufficient—which they clearly were—to charge a fraudulent scheme resulting in the issuance of its own stock, the District Court held that Consolidated was not a seller, and that there had been no sale. The complaint was dismissed for failure to state a claim under the statute and regulation, and in the absence of such a claim, no ground existed for extraterritorial service of process on the nonresident defendants. The District Judge faced the issue squarely and decided it just as forthrightly. Now the defendants naturally assert other grounds which support the result even though we might disagree with the District Court's stated reason. Following tit for tat, the Trustee joins them with like energy. This has resulted in considerable preoccupation with the nature of the rights to stock in the Cuban insurance company and the Honduran oil exploration transactions. Whether either one or both of these amounted to a sale of a security by Mid-Atlantic and therefore a "purchase" by Consolidated, we need not decide since we are clear that Consolidated "sold" its own stock and to be a seller is enough. One need not be both.

## II.

### Issuing Corporation is a Seller.

### Issuance of Stock is a Sale.

■■ We need not repeat here the history now so well catalogued which traces the exercise by the SEC of the legislative power granted in § 10(b) [2] to

2. Section 10(b), Securities Exchange Act of 1934.
"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
 * * * * *
"(b) To use or employ, in connection with the purchase or sale of any security

registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C.A. § 78j(b).

promulgate regulation X–10B–5.[3] A significant purpose of X–10B–5 was to extend to *sellers* the same protection against fraudulent and other unlawful schemes afforded to those defrauded in the *purchase* of securities.[4] In a substantive way it is even more sweeping. It greatly expands the protection frequently so hemmed in by the traditional concepts of common law misrepresentation and deceit, the requirement of privity, proof of specific damage, inadequacy of the right of rescission or right to recover up to par value of stock of a much greater market value. To these difficulties would have to be added the geographic obstacle of suit in a common forum against multi-state defendants scattered as far as the fraudulent device required.[5] And along with the Second, Third and Ninth Circuits,[6] we now adopt, as we earlier foreshadowed,[7] the principles set forth in the trail-blazer decision of Kardon v. National Gypsum Co., E.D. Pa., 1946, 69 F.Supp. 512, that a violation of rule 10B–5 gives rise to a private right of action. And this private right of action arises where facilities of the mail or interstate communications are used in connection with the sale or purchase of securities even though the transaction is conducted directly between the buyer and seller and not through a securities exchange or an organized over-the-counter market.[8]

The argument against allowing recovery to a corporation issuing its own stock in exchange for a consideration, cash or property, runs somewhat this way. It is recognized that § 10(b) is not self-executing. It only makes unlawful that which SEC forbids by "such rules and regulations as the Commission may prescribe as necessary or appropriate." See note 2, supra. But since the test of necessity or appropriateness is "the public interest or for the protection of investors," regulation X–10B–5 can give rise to a private right only in the event the "seller" or "purchaser" is an "investor." The forensic climax is that whatever else it might be, such an issuing corporation is not an investor.

But this argument is an artificial application of the concept that violation of a legislative standard gives those

---

3. Rule X–10B–5.
 "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
 "(1) to employ any device, scheme, or artifice to defraud,
 "(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 "(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
 in connection with the purchase or sale of any security." 17 C.F.R. 240.10b–5.

4. Rule X–10B–5 was patterned upon the language of § 17(a) of the Securities Act of 1933, 15 U.S.C.A. § 77q(a) but added words to cover fraud if perpetrated on sellers as well as purchasers. See Birnbaum v. Newport Steel Corp., 2 Cir., 1952, 193 F.2d 461; Fratt v. Robinson, 9 Cir., 1953, 203 F.2d 627, 37 A.L.R.2d 636. Reference is also generally made to the excellent comment, "The Prospects for Rule X–10B–5: An Emergency Remedy for Defrauded Investors," 59 Yale L.J. 1120, see especially 1121–1122 (1950). See also White, "Swindlers and the Securities Act," 45 A.B.A.J. 29 (1959).

5. 59 Yale L.J. 1120, 1123–26, 1137, 1131, 1138.

6. Fischman v. Raytheon Mfg. Co., 2 Cir., 1951, 188 F.2d 783; Slavin v. Germantown Fire Ins. Co., 3 Cir., 1949, 174 F.2d 799; Fratt v. Robinson, 9 Cir., 1953, 203 F.2d 627, 37 A.L.R.2d 636; Errion v. Connell, 9 Cir., 1956, 236 F.2d 447.

7. We recognized this principle in Reed v. Riddle Air Lines, 5 Cir., 1959, 266 F.2d 314, at page 315, but relief was denied on the facts.

8. Fratt v. Robinson, 9 Cir., 1953, 203 F.2d 627, 37 A.L.R.2d 636; Northern Trust Co. v. Essaness Theatres Corp., D.C. N.D.Ill., 1952, 103 F.Supp. 954; Robinson v. Difford, D.C.E.D.Pa., 1950, 92 F.Supp. 145; Speed v. Transamerica Corp., 3 Cir., 1956, 235 F.2d 369.

intended to be protected a private right of action provided the injury sustained is other than that suffered by the public generally. See, generally, Restatement of Torts, §§ 286–288. The SEC had ample power to promulgate this regulation. It had two bases—"in the public interest" or "for the protection of investors." Each fully justified the regulation. Its validity does not therefore depend on its being issued "for the protection of investors." Granted that interpretation and application of a regulation may not cover matters beyond the limits of its legislative source, an inability of one to bring himself within one specific statutory basis would not foreclose his right as to the other. That the other basis is "in the public interest" does not make all those intended to be protected by it have merely the standing of the public generally. Quite obviously the broad purpose of this legislation was to keep the channels of interstate commerce, the mail, and national security exchanges pure from fraudulent schemes, tricks, devices, and all forms of manipulation. Just as obviously those sought to be protected were the very persons who would be engaged in buying and selling and trading in corporate securities as broadly defined in the Act. Certainly a person who parts with stock owned by him as the result of fraudulent practices wrought on him by his purchaser sustains an adverse impact that differentiates him from the damage suffered by the public generally. It is not essential, therefore, that for an issuing corporation to come under § 10(b) and Rule X–10B–5 it have the status of an "investor" as such.

■ Freed of any implied limitation of "investor" status, does such corporation otherwise come within the section and the rule?

Certainly the regulation uses language which would comprehend an issuing corporation. It makes it unlawful for "any

person * * * to employ any * * * scheme * * * to defraud, to make an untrue statement * * * or, to engage in any act * * * which operates * * * as a fraud or deceit upon any person * * *." See note 3, supra. The Act supplies its own definition to make a "person" encompass "a corporation." § 3(a) (9), 15 U.S.C.A. § 78c (a) (9). If an issuing corporation is not within the regulation, it is not because it is not a "person." This means, then, that to exclude it from X–10B–5 it must be because there is no "sale of any security" and hence the issuer is not a "seller." Again, the first hurdle encountered is the wording of the statute. In the plainest of language it provides that "the term 'security' means * * * any * * * stock * * * or right to * * * purchase * * * any [stock]." § (3) (a) (10), 15 U.S.C.A. § 78c(a) (10). What Consolidated issued was its own stock certificates in the usual form. This stock was a security within the statute and regulation and was the subject of the transaction between Consolidated and Mid-Atlantic.

The effort to escape the impact of X–10B–5 finally boils down to the assertion that the transfer of this admitted security could not have been a "sale." As before, the statute is remarkably rich in the legislative determination of critical terms. The Act provides that "the terms 'sale' and 'sell' each include any contract to sell or otherwise dispose of." § 3(a) (14), 15 U.S.C.A. § 78c(a) (14).[9] Certainly the transactions between Consolidated and the apparent transferee, Mid-Atlantic, had many earmarks of a sale. Mid-Atlantic had properties which it ostensibly valued highly. It was willing to trade these properties as consideration for the Consolidated stock. Consolidated, on the other hand, had its own stock which had a marketability of $1 per share. To the corporation it had the same economic value as would the pro-

---

**9.** By their nature terms "sell" and "purchase" are correlative in many ways. The statute is equally broad as to "purchase." "The terms 'buy' and 'purchase' each include any contract to buy, purchase, or otherwise acquire." § 3(a) (13), 15 U.S.C.A. § 78c(a) (13).

ceeds received from a public issue of like shares to acquire property which it desired and which it had been led to believe was valuable. Before the transaction Consolidated had 700,000 shares of stock. After the transaction it no longer had the stock, but it had, or thought it had, the property. If this is not a sale in the strict common law traditional sense, it, certainly amounted to an arrangement in which Consolidated "otherwise dispose[d] of" its stock. § 3(a) (14), 15 U.S.C.A. § 78c(a) (14).

Even in our remote position, we would be blind to all we hear and read about were we to succumb to the artificial contention that the issuance of this stock made the corporation no poorer so that the only persons who suffered were the stockholders for whom the suit cannot be brought by the Trustee. It may be that Cash McCall is a fictional character, but his story is that of the postwar business community in which from the ubiquitous quest for capital gains, the larger swallows up the small to become big only to become shortly swallowed up by the biggest. In this process, the thing of value transferred in exchange for assets or the capital stock of the enterprise being acquired is the capital stock of the acquiring corporation. Considering the purpose of this legislation, it would be unrealistic to say that a corporation having the capacity to acquire $700,000 worth of assets for its 700,000 shares of stock has suffered no loss if what it gave up was $700,000 but what it got was zero. If—as we very much doubt—accountants would support any such contention as a

consequence of the esoteric mysteries of the double entry system, Liston Zander Credit Co. v. United States, 5 Cir., 1960, 276 F.2d 417, 422, the law with its eye on reality would have to part company with such purists.

Neither statutory terminology nor practical business legal considerations support the contention that, as a matter of law, Consolidated in issuing its stock was not a seller and the transaction was not a sale. All that is left is reliance upon statement [10] made by the Second Circuit in the course of its decision in Howard v. Furst, 2 Cir., 1956, 238 F.2d 790, certiorari denied 353 U.S. 937, 77 S.Ct. 814, 1 L.Ed.2d 759. We find it unnecessary and undesirable to undertake any criticism either of that decision or the comments made with respect to a civil action brought as a stockholders' derivative suit alleging a violation of § 14(a) and Rule X–14A–9 on solicitation of proxies. We decline, as we think that Court would, to read into its language a holding that a corporation injured by a sale or purchase of securities has no private right of action under § 10(b) and X–10B–5.

### III.

### Act or Transaction in Alabama.

A serious question yet remaining is whether the complaint sufficiently alleges acts occurring within the Middle District of Alabama. If it does, then the extraterritorial provisions in § 27, 15 U.S.C.A. § 78aa, support service of process in Colorado, New York and Pennsylvania where the defendants reside.[11] None resides in Alabama.

10. The portion of the opinion pressed successfully on the District Court reads this way. "There is literally nothing to support the view that any substantive rights were created for the benefit of the corporation." 238 F.2d 790 at page 793. The District Judge below also quoted from the trial court's opinion, 140 F.Supp. 507, 512, affirmed by the Second Circuit. "It was the individual investor who was without effective recourse prior to the enactment of the statute. There is no suggestion that Congress found the rights of the corporation, as already protected by derivative action, inadequately provided for."

11. "The district courts of the United States * * * shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder. Any criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred. Any suit or action to enforce any liability

The test for a civil action is that applicable to a criminal proceeding under the Act which "may be brought in the district wherein any act or transaction constituting the violation occurred." Of course that is not to say that a civil action with potential jurisdiction over non-resident defendants may not be maintained in circumstances where a criminal proceeding would fail. It does mean, however, that there must have been within the forum district acts constituting a civil violation of the particular statute or regulation giving rise to the private right of action.

Here the essence of the fraud is that the defendants confected a scheme to get Consolidated to issue 700,000 shares of stock for worthless property ostensibly owned by Mid-Atlantic in order that the individuals could divide up the Consolidated stock as loot and thereby reap the fruits of the fraud. What made this evil scheme a violation of the statute and the regulation was that the defendants directly or indirectly used means or instrumentalities of interstate commerce or of the mails "in connection with the purchase" of the stock from Consolidated. The fraudulent scheme need not be hatched in the forum district. Nor is it necessary that a false or deceptive or fraudulent paper be sent or statement made through the use of the mails or interstate communication facilities. We are of the clear opinion that this is the rule for actions under § 10(b) and Rule X–10B–5 regardless of what the proper rule under § 12 of the Securities Act of 1933, 15 U.S.C.A. § 77*l*, might be. Cf. Kemper v. Lohnes, 7 Cir., 1959, 173 F.2d 44. Practically every case discussing this [12] relies on our earlier opinions in Kopald-Quinn & Co. v. United States, 5 Cir., 1939, 101 F.2d 628, certiorari denied Ricebaum v. United States, 307 U.S. 628, 59 S.Ct. 835, 83 L.Ed. 1511, and Pace v. United States, 5 Cir., 1938, 94 F.2d 591. There the selling was done by verbal contact and negotiation with the only use of the mails being transmission of written confirmations of sale. To the contention that to constitute an offense under the Securities Act it was necessary to prove a scheme to effect sales and the actual making of sales of securities by mail, we had this to say. "We think the construction thus urged for the Act unduly narrows the language used in it, unduly limits its scope and effect." Kopald Quinn & Co. v. United States, supra, 101 F.2d 628 at page 632.

We think that any use of instrumentalities of the mails or other interstate facilities made within the forum district constituting an important step in

---

or duty created by this chapter or rules and regulations thereunder * * * may be brought in any such district * * and process in such cases may be served in any other district of which the defendant is an inhabitant * * *." § 27, 15 U.S.C.A. § 78aa.

12. United States v. Monjar, 3 Cir., 1944, 147 F.2d 916 at page 920 (violations of the Mail Fraud Act, 18 U.S.C.A. § 338 and fraud provisions of the Securities Act, 15 U.S.C.A. § 77q(a) (1), 18 U.S.C.A. § 88. This rule was followed in Northern Trust Co. v. Essaness Theatres Corp., N.D.Ill., 1952, 103 F.Supp. 954, 963–964, and it seems certain that the Third Circuit would apply its Monjar rule to a § 10(b) case. Slavin v. Germantown Fire Ins. Co., 3 Cir., 1949, 174 F.2d 799 at page 814 (dissenting opinion). In all cases the Courts rely on the analogy of the Mail Fraud Statutes citing cases such as Landay v. United States, 6 Cir., 1939, 108 F.2d 698, 701, where the mailing of a stock certificate was held sufficient use of the mails even though that mailing was not itself fraudulent. A mailing need not be deceptive in and of itself; it may be completely innocuous but still sufficient to constitute an offense if connected with the scheme to defraud. Gregory v. United States, 5 Cir., 1958, 253 F.2d 104, 109. And to cause the mails to be used it is sufficient if the use of the mails can reasonably be foreseen though not actually intended. Pereira v. United States, 1954, 347 U.S. 1, 8, 9, 74 S.Ct. 358, 98 L.Ed. 435; see also Abbott v. United States, 5 Cir., 1956, 239 F.2d 310 at page 314. "The statute forbids the *use* of the mails as a means of consummating frauds, and if the mail is used in its actual execution, it matters not whether it was intended or anticipated."

the execution of the fraudulent, deceitful scheme or in its consummation is sufficient. Generally speaking we would say that any act which would be sufficient to constitute an offense under the mail fraud, or similar criminal statutes, occurring within the forum district would be adequate to authorize extraterritorial service of process under § 27, note 11, supra. This approach automatically reads into this Act general provisions such as 18 U.S.C.A. § 3237 designed to overcome the result in United States v. Johnson, 1944, 323 U.S. 273, 65 S.Ct. 249, 89 L.Ed. 236, that jurisdiction is in "any district from, through, or into which" interstate commerce or mail matter moves.

 Here the facts are alleged with adequate clarity to show a factor of material importance occurring within Alabama. The telephone call from Cage (in Texas or at least outside of Alabama) to management of Consolidated located in Alabama was an occurrence taking place in Alabama as well as Texas. Interstate communication facilities were used within Alabama to cause the transfer of $10,000 to be made to the Cuban insurance company. This was an important step in the consummation of the scheme. Actually, it was also fraudulent since Cage represented that Consolidated already owned the Cuban company and to save its investment, the funds sought and furnished were urgently needed. Thus, here there was a use of interstate facilities as a means of transmitting a fraudulent statement.

It is apparent that the language in § 27, note 11, supra, describing the venue district as "the district wherein any act or transaction constituting the violation occurred" cannot mean the district in which all acts took place, or in which the transaction as a whole was consummated. The statute was one designed to put an end to interstate frauds in the sale and trading of securities. The legislative pattern envisages the likelihood that actions would take place in many places requiring the frequent use of instrumentalities of the mail or of communication. The Act meant to vest jurisdiction in every district where any use of such instrumentalities of the mail or interstate commerce was of material importance to the consummation of the scheme.

## IV.

### The Statute of Limitations.

While the parties did not press this below and the District Court did not pass on it, all defendants assert in support of the correctness of the judgment of dismissal the contention that the complaint showed on its face that the action was not timely brought.

 The complaint was filed November 25, 1959. The occurrences complained of took place in October–December 1956. The limitation statutes of the forum state apply to actions of this kind under the SEC Act.[13] The Alabama statutes [14] are unavailing as the complaint was not filed within one year of the accrual of the claim or within one year after the existence of the fraud was discovered. The Trustee relies on § 11, sub. e, of the Bankruptcy Act permitting suits by a Trustee on claims not then time-barred if brought "within two years subsequent to the date of adjudication or within such further period of time as the Federal or State law may permit * * *." 11 U.S.C.A. § 29, sub. e. Consolidated was adjudicated a bankrupt in May 1957. The one-year limitation under Alabama law on fraud had not run at that time. Of course, on the words of the statute standing alone, the two-year period had expired in May 1959, some six months before the complaint was filed.

---

13. Actions under Rule X–10B–5 the applicable statute of limitations is that of the state in which the Federal Court sits. Tobacco & Allied Stocks v. Transamerica Corp., 3 Cir., 1957, 244 F.2d 902; Fratt v. Robinson, 9 Cir., 1953, 203 F.2d 627, 634, 37 A.L.R.2d 636; Connelly v. Balkwill, D.C.N.D.Ohio, 1959, 174 F.Supp. 49, 63–64; Errion v. Connell, 9 Cir., 1956, 236 F.2d 447.

14. Alabama Code, Title 7, §§ 26 and 42.

■ But this is no insurmountable obstacle for we agree with Dabney v. Levy, 2 Cir., 1951, 191 F.2d 201, that the two-year limitation prescribed in § 11, sub. e does not begin to run until the time the fraud reasonably should have been discovered. That Court applied the teaching of Bailey v. Glover, 1875, 21 Wall. 342, 88 U.S. 342, 22 L.Ed. 636, subsequently applied in Holmberg v. Armbrecht, 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743, 748, which declared that "this equitable doctrine is read into every federal statute of limitation." See 1 Collier, Bankruptcy § 11.13, Pages 1188–1189 (1959 Supp.).

The complaint alleges affirmatively that it was filed within two years of the time the fraudulent scheme was discoverable by the use of reasonable diligence. This is adequate to withstand a motion to dismiss. Of course, proof will have to be made and the trial court should be allowed considerable flexibility in adapting procedures for the trial and determination of this threshold issue. Viewing the case on a record made up of the complaint and a small assortment of letters attached to various motions, we could not undertake to indicate at this juncture whether this issue is sufficiently severable from the intrinsic transactions out of which the fraud is alleged to have arisen, so that a separate trial would be feasible, the determination of which might conceivably put an end to further costly and difficult litigation. This has been done, but, of course, the trial court must be careful lest a truncated proceeding adversely affect rights.[15]

## V.
### Standing of Trustee to Sue.

■ The defendants attack the Trustee's right, title or status to sue on behalf of Consolidated to recover damages or obtain other relief by reason of the alleged fraudulent scheme. They reason that while the SEC Act gives a remedy, what is asserted is essentially a claim for fraud or deceit.[16] Consequently, they contend, the action is one personal to the victim, is not assignable, and therefore does not vest in the Trustee.[17] Akin to this is the further suggestion that if, despite the fraud, the claim is otherwise assignable, it would not be so under § 70 of the Bankruptcy Act, 11 U.S.C.A. § 110, sub. a, since, no creditors any longer being adversely affected, the only persons to benefit will be the stockholders, not the corporation. It is the corporation whose property interests are alone transferred to the Trustee by the bankruptcy law.[18]

We think there is nothing to this contention. For the reasons we have set forth in so much detail, Consolidated as a seller sustained a substantial loss measured at least in terms of properties which could have been acquired by the corporation through the issuance of 700,-000 shares of its own stock. Such a claim is not one personal to the bankrupt excluded either under express terms of the bankruptcy statute[19] or by general con-

[15]. See, e. g., Crummer Co. v. DuPont, 5 Cir., 1955, 223 F.2d 238, especially Crummer Co. v. DuPont, 5 Cir., 1958, 255 F.2d 425, reversing a directed verdict after jury trial on the preliminary issue of limitation; after remand it is our understanding the jury found that limitations had run thus putting an end to the litigation.

[16]. They cite Fischman v. Raytheon Mfg. Co., 2 Cir., 1951, 188 F.2d 783; Norris & Hirshberg, Inc. v. S. E. C., 1949, 85 U.S. App.D.C. 268, 177 F.2d 228; Fratt v. Robinson, 9 Cir., 1953, 203 F.2d 627; Ward LaFrance Truck Corp., 13 S.E.C. 372, 381.

[17]. They cite Phillips v. Malone, 1931, 223 Ala. 381, 136 So. 793; Wogahn v. Stevens, 1940, 236 Wis. 122, 294 N.W. 503, 133 A.L.R. 1033.

[18]. Defendants cite United States v. Jones, 10 Cir., 1956, 229 F.2d 84; Boger v. Jones Cotton Co., 1937, 234 Ala. 103, 173 So. 495.

[19]. § 70, sub. a (5) carries its own exclusion:
"* * * rights of action ex delicto for libel, slander, injuries to the person of the bankrupt or of a relative, whether or not resulting in death, seduction, and criminal conversation shall not vest in the trustee * * *." 11 U.S.C.A. § 110, sub. a (5).

siderations of the law. In any event, since a corporate bankrupt is an inanimate entity, there is respectable authority that an action based on fraud as to a corporation plaintiff is as a matter of law an injury to property. 4 Collier, Bankruptcy, § 70:28(6); see also Empire Tractor Corp. v. Time, Inc., D.C.E.D.Pa., 1950, 91 F.Supp. 311; Thomason v. Miller, Tex.Civ.App., 1928, 4 S.W.2d 668 (writ dism'd). The objection of the absence of any "property" to be transferred fares no better as it is established that a Trustee may enforce liability under state statutes where watered stock has been issued even though no asset was transferred. In re Pipe Line Oil Co., 6 Cir., 1923, 289 F. 698; 4 Collier on Bankruptcy, § 70:29.

By reason of the alleged fraud Consolidated parted with that which on its current value could have enabled the corporation to acquire property of substantial value. Instead of getting like value by the purported transfers from Mid-Atlantic, it got nothing. This action seeks damages, accounting for profits and other relief to compensate for that loss sustained by the corporation. That it accrued from fraud makes it no less a loss thought of in terms of property. As to such corporate loss, the Trustee is the sole representative.

## VI.
### Consolidated in Pari Delicto
### and
### Other Incidental Defenses.

 At least one of the defendants urges that the Trustee cannot recover as the complaint reflects on its face that Consolidated was in pari delicto with the alleged defrauding conspirators. The thesis seems to be this. The complaint alleged that all of Consolidated's stock issued and outstanding as of the time of bankruptcy was "issued in transactions in which the stock was *allegedly* exempt

from registration with the" SEC. Later it alleged that the New York defendant falsely represented to the stock transfer agent that the proposed issue of 700,000 shares was exempt from SEC registration. In view of this, so the argument goes, if the stock originally issued by it or the 700,000 shares issued as a result of the fraudulent scheme were subject to SEC registration as the complaint negatively implied, the corporation is in pari delicto and cannot recover.[20] The Trustee is a successor and has no additional standing.

Variations of this attack as well as others are also asserted. One contention is that the complaint showed that Mid-Atlantic had already been dissolved before the 700,000 shares of stock of Consolidated were transferred to it. Consequently there was no "purchaser." On the other hand, it alleged that all of the steps taken by Consolidated were done by and through persons who no longer were officers with authority to bind the corporation. Therefore, there was no "seller." The conclusion is thereupon urged that there could have been no sale or purchase in the absence of a seller or a purchaser or both.

 A further suggestion is made that in view of these allegations of unauthorized acts by former officers of Consolidated, the stock issue was entirely void even in the hands of bona fide purchasers so that no loss was sustained by Consolidated. The contention is that from Consolidated's standpoint the worst was that the 700,000 shares of stock could have been cancelled either by the corporation or through a derivative suit or the holders could be assessed for par value.[21]

In our judgment none of these contentions has merit. In whatever form, and however stated or restated, these arguments ignore the scheme alleged in the

20. Cited are the cases of Reilly et al., Trustees v. Clyne, 27 Ariz. 432, 234 P. 35, 40 A.L.R. 1005; Miller v. California Roofing Co., 55 Cal.App.2d 136, 130 P. 2d 740; Deckert v. Independence Share Corp., 1940, 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189; Rosenberg v. Hano, D.C.

E.D.Pa., 1940, 39 F.Supp. 714; affirmed 3 Cir., 1941, 121 F.2d 818.

21. Defendants cite Delaware Constitution Art. IX, § 3, Del.C.Ann.; Delaware Code, Title 8, §§ 152, 163, 164. See, e. g., Baker v. Bankers Mortgage Co., 1926, 15 Del.Ch. 183, 133 A. 698.

complaint by which these individuals and Mid-Atlantic undertook to get Consolidated to take action which it otherwise would not take and which, but for the misrepresentations and fraud, it would not have taken. That certainly comprehends active misrepresentations resulting in the stock transfer agent issuing 700,000 shares of stock. The theory of the complaint is not that it lost 700,000 shares of stock. Rather, it lost what 700,000 shares of its stock at its then current value would have procured in the acquisition of new properties. A corporation duped by fraud into parting with this valuable capability is certainly not a knowing party to such fraud. It is not confined to a mere cancellation of that stock nor subjected to the expense of multiple litigation against a large number of holders (many perhaps innocent) to assert a claim for the nominal par value (1¢) of this stock, the successful recovery of which would net $7,000, not what 700,000 shares would have purchased.

The cause must therefore be reversed and remanded for further consistent proceedings.

Reversed and remanded.

CAMERON, Circuit Judge, dissents.

Rehearings denied: CAMERON, Circuit Judge, dissented.