444 F.2d 1241
 Fed. Sec. L. Rep. P 93,085
George Lewis BAILES, Jr., as Trustee in Bankruptcy of
American Southern Publishing Company, Inc., a
corporation, Bankrupt, Plaintiff-Appellant,
v.
COLONIAL PRESS, INC., et al., etc., Defendants-Appellees.
 No. 29048.
 United States Court of Appeals, Fifth Circuit.
 June 15, 1971.
 
 R. Clifford Fulford, Max Pope, Birmingham, Ala., for plaintiff-appellant; Levine, Fulford & Pope, Birmingham, Ala., of counsel.
 Walter Mims, George Case, Jr., David J. Vann, A. Berkowitz, R. B. Jones, Birmingham, Ala., E. W. Skidmore, Tuscaloosa, Ala., for defendants-appellees; Berkowitz, Lefkovits & Patrick, Bainbridge & Mims, McGowen & McGowen, Birmingham, Ala., of counsel.
 Before RIVES, WISDOM and GODBOLD, Circuit Judges.
 
 RIVES, Circuit Fudge:
 
 1
 This appeal is from a judgment granting the defendants' motions to dismiss the complaint of the plaintiff Trustee in Bankruptcy of American Southern Publishing Company, Inc. Jurisdiction of the district court was invoked under Section 27 of the Securities Exchange Act of 1934, 15 U.S.C.A. 78aa.[1] The complaint seeks to recover damages under Section 10(b) of that Act, 15 U.S.C.A. 78j(b),[2] and S.E.A. Rule 10b-5, 17 C.F.R. 240,10b-5.[3]
 
 
 2
 The district court in a memorandum opinion[4] held the complaint barred by limitations upon reasoning which seems to present also the question of whether the complaint states a claim under the Securities Exchange Act on which relief can be granted. While the district court's opinion is well-reasoned and we find no direct precedent to the contrary, we do reach a different conclusion and do reverse.
 
 I. Sufficiency of Claim
 
 3
 According to the complaint as amended, the Bankrupt acquired by stock issue the assets and liabilities of Colonial Press, Inc., an Alabama corporation which published and sold books-- principally textbooks to the State of Alabama. Its manager Twitty bought all of its stock in February 1963 for $6,000.00. A year later on February 6, 1964, Twitty and some of the other defendants caused American Southern, the bankrupt, to be incorporated in Alabama. The certificate of incorporation reflected that the total authorized stock of American Southern was $1,000,000.00, divided into a million shares of the par value of $1.00 each, It began business with $250,000.00 capital stock fully paid and nonassessable.[5] The certificate of incouporation represented Colonial Press, Inc., as having subscribed and paid for in cash or its equivalent 179,500 shares. On or about February 6, 1964, the date of American Southern's incorporation, the defendants caused it to issue to Colonial Press a total of 412,000 shares for a transfer to it of the assets and liabilities of Colonial Press represented to have a net worth of $412,000.00, 'when in truth and in fact the said Colonial Press was then insolvent and had an excess of liabilities over assets so transferred of $11,942.75.'
 
 
 4
 As a further part of a scheme to defraud and to obtain monies to cover the deficit transferred by Colonial Press to American Southern, the defendants registered the stock of American Southern with the Securities Commissioner of Alabama for sale to the general public in the State at $2.00 per share. The order registering the stock was issued by the State Securities Commissioner on March 27, 1967. The 'stock was sold by defendants to the general public for $2.00 per share both before and after the entry of said order * * *.'
 
 
 5
 The complaint details many instances of overstatement of assets and understatement of liabilities which accompanied the alleged scheme to defraud. Paragraph 8 of the complaint was amended by adding the following:
 
 
 6
 'The parties affected by such a fraud and deceit included not only AMERICAN SOUTHERN as a corporate entity but also the United States Government to whom taxes due from COLONIAL PRESS and AMERICAN SOUTHERN were not and have not been paid, persons contracting and dealing with AMERICAN SOUTHERN (including authors and other creditors), and the general public, including investors to whom the securities of AMERICAN SOUTHERN were sold and offered for sale whose rights are part of the trust being administered by the plaintiff-Trustee. Prospectuses on which such securities were sold and offered for sale were published and made available to purchasers and prospective purchasers of such securities and to others.'
 
 
 7
 We think that the district court has taken too narrow a view of the February 6, 1964 issuance of stock to Colonial Press, Inc. That was the beginning, not the end, of the alleged scheme to defraud. The plan of promotion included not only the February 6, 1964 issuance of stock but later stock issues, overstatements of assets, and understatements of liabilities. From its inception the scheme to defraud was intended to operate in futuro and it did so operate. Among the persons thereafter defrauded were the United States, persons contractiong or dealing with American Southern, and purchasers of its stock.
 
 
 8
 True, as the district court indicated, such persons other than American Southern might have brought independent actions whether based on the Securities Act or not. The statement under oath as to the amount of subscriptions paid in,[6] if fraudulently erroneous, as alleged, would have been good ground for a quo warranto proceeding to 'vacate the charter or annul the existence' of the corporation. Floyd v. State, 1912, 177 Ala. 169, 59 So. 280. The opinion in that case quotes from Burke v. Smith, 1872, 16 Wall. 390, 396, 397 in part as follows:
 
 
 9
 'The purpose of such a requisition is that the state may be assured of the successful prosecution of the work, and that creditors of the company may have, to the extent at least of the required subscription, the means of obtaining satisfaction of their claims. The grant of the franchise is, therefore, made dependent upon securing a specified amount of capital.'
 
 
 10
 59 So. at 285. The entire 412,000 shares were purchased by Colonial Press, Inc., at the same price per share. Persons thereafter dealing with American Southern were justified in believing that it began business with a net worth which included the $412,000.00 purchase price. The fact that persons damaged by dealings with American Southern might have brought independent actions based on the Securities Act, as well as actions not so based, does not preclude American Southern, or its Trustee, from suing for the damage to itself as a corporate entity,[7] thereby effectively pursuing a remedy which might alleviate some of the results of the promoters' fraud. Indeed that is especially appropriate in a court of bankruptcy operating under principles of equity.[8]
 
 
 11
 At common law the promoters of a corporation stand in a fiduciary relation to the corporation, charged with the duty of good faith as in cases of other trusts. The fiduciary relation continues until the plan or scheme of promotion has been accomplished. Where the plan contemplates simply the organization of the corporation, the promoters' duties end there; but where the plan includes the continued operation of the corporation, its incurrence of taxes, debts and liabilities, and theprocurement of capital by sale of the corporation's stock to the public, the obligation of good faith continues to the completion of the plan. The foregoing principles applicable to a suit at common law by a corporation against its promoters are established by the authorities listed in the margin.[9]
 
 
 12
 The district court expressed one of its reasons for dismissing the complaint as follows:
 
 
 13
 'The complaint here charges every stockholder, director, and officer of the corporation at the time of the transaction complained of as a participant in the deception. Every possible agent and beneficial owner of American Southern at the time of the transaction is charged as a participant. No one is left to have been deceived.'
 
 
 14
 That reason would not suffice if this suit were at common law for breach of the fiduciary duties owed by the promoters to the corporation, because the alleged scheme or plan of promotion includes the continued operation of American Southern as a corporation, its incurrence of the usual kinds of liabilities incident to such operation and the sale of stock of the corporation to the public, and the promoters' fiduiary duties to the corporation continue to the completion of that scheme or plan.
 
 
 15
 This action is, of course, not based on the common law, but is brought to enforce a liability or duty created by the Securities Exchange Act of 1934, and more specifically by Section 10(b) of that Act and S.E.A. Rule 10b-5, quoted in notes 2 and 3, supra. Nonetheless many of the principles applicable to common law suits apply by analogy to the present action.
 
 
 16
 It is settled in this Circuit that, by the issuance of stock to Colonial Press, American Southern became a 'seller' of secureties for purposes of the Securities Act, Hooper v. Mountain States Securities, 5 Cir. 1960,282 F.2d 195, and that, therefore, it has standing to seek redress for violations of those laws. See Herpich v. Wallace, 5 Cir. 1970, 430 F.2d 792; Cooper v. Garza, 5 Cir. 1970, 431 F.2d 587.
 
 
 17
 There is sufficiently alleged a claim under Rule 10b-5(3), which prohibits 'any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.' Fairly read, the amended complaint claims that American Southern's officers, directors and shareholders caused the corporation to engage in acts which would operate as a fraud or deceit upon others, even though at the time American Southern engaged in the proscribed acts all persons then interested in the corporation had knowledge. Paragraph 8 of the amended complaint may fairly be construed to allege a continuing scheme, of which the 1964 transaction was but the beginning, and which from its inception[10] was intended to and in fact did operate in futuro to deceive and damage various persons who predictably would rely upon the bona fides of the issuance of stock to Colonial Press.
 
 
 18
 Paragraph 8 alleges that the scheme resulted in damage to, among others, 'persons contracting and dealing with AMERICAN SOUTHERN (including authors and other creditors).' In dealing with American Southern after the 1964 transaction, such persons would be justified in believing that it began business with a net worth which included the $412,000.00 it was represented to have received from Colonial Press. It could be anticipated that, in reliance on these misrepresentations, some of these persons would extend credit in one form or another to American Southern which they might well have refrained from extending had they known the true state of the corporation's finances. The corporation was thereby exposed to the risk that it would be caused to assume liabilities to creditors which, but for the misrepresentations, it would not have assumed, and which ultimately it would be unable to satisfy due to the absence of the $412,000.00 it was represented to, but did not, possess.
 
 
 19
 Paragraph 8 contains similar allegations with respect to subsequent shareholders, that is, that the corporation was caused to issue shares to the general public. Thus the corporation was thereby exposed to the risk that this class of persons, too, would assert claims against it.
 
 
 20
 American Southern cannot successfully maintain a 10b-5 action if proscribed acts it was caused to do did not operate as a fraud or deceit upon itself or upon others-- subsequent creditors, subsequent public shareholders or subsequent holders of claims for taxes. The gravamen of a 10b-5 cause of action is deception,[11] and if neither the corporation nor 'any (other) person,' was deceived or defrauded, the corporation cannot proceed under this statutory federal remedy.
 
 
 21
 Mindful of the 'accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief,' Conley v. Gibson, 1957, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80, 84, we hold that the amended complaint stated a claim for relief under Section 10(b) of the Securities Exchange Act of 1934 and under S.E.A. Rule 10b-5.
 
 II. Limitations
 
 22
 In Hooper v. Mountain States Securities, supra, 282 F.2d at 205, n. 14, we held the one-year state statute of limitations, Ala.Code Tit. 7, 26 and 42, applicable to actions of this kind under the Securities Exchange Act. Ala.Code Tit. 7, 42 provides:
 
 
 23
 'In actions seeking relief on the ground of fraud where the statute has created a bar, the cause of action must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud, after which he must have one year within which to prosecute his suit.'
 
 
 24
 By amendment the following averments were added to the complaint:
 
 
 25
 '8. (a) Further, such fraud and deceit was not discovered and could not reasonably have been discovered by any party or parties adverse to defendants until after October 7, 1966 when the petition under the Bankruptcy Act was filed and the Receiver (Trustee) appointed; and it was thereafter discovered and confirmed only after intensive and extensive work by Trustee, his attorneys and accountants.'
 
 
 26
 The district court held that 'the applicable state statute of limitations had run prior to filing of the bankruptcy action.' It based that holding on its view that the right of action accrued on February 6, 1964 when American Southern issued 412,000 shares of its stock for the assets and liabilities of Colonial Press of nearly $12,000.00 negative net value. American Southern was a 'seller' on February 6, 1964 when its stock was issued for the Colonial Press assets. We need not decide whether the deception practiced upon it was then cognizable under 10b-5 or whether that deception ripened into consequences so cognizable by the over-all scheme being pursude to the point that stock was placed in the hands of public stockholders or that subsequent creditors were deceived. That is to say, we need not decide whether the statute of limitations began to run on February 6, 1964 or sometime later when the over-all scheme to defraud had been pursued to the point of 'connection with the purchase or sale' of a security proscribed by the Securities Exchange Act. In any event, whether under Alabama Code Title 7, 42, or under federal law which this Court has held applicable, Azalea Meats, Inc. v. Muscat, 1967, 386 F.2d 5, 8, the complaint states a case where the fraud had not been discovered by any person not himself a party to the fraud until after October 7, 1966 when the petition in bankruptcy was filed. The action had not been barred by limitations prior to that date.
 
 
 27
 This action was instituted on March 27, 1968, well within the period of two years allowed to the Trustee by Section 11(e) of the Bankruptcy Act, 11 U.S.C.A. 29(e). See Hooper v. Mountain States Securities, supra, 282 F.2d at 205, 211.
 
 
 28
 The judgment is therefore reversed and the cause remanded.
 
 
 29
 Reversed and remanded.
 
 APPENDIX
 MEMORANDUM OPINION
 Filed: Oct. 7, 1969
 
 30
 in the United States District Court for the Northern District of Alabama, Southern Division
 
 
 31
 George Lewis Bailes, Jr., as Trustee in Bankruptcy of American Southern Publishing Company, Inc., a corporation, Bankrupt, Plaintiff, v. Colonial Press, Inc., a corporation, et al., Defendants.
 
 Civil Action No. 68-164
 
 32
 This cause is brought by the plaintiff in his capacity as Trustee in Bankuptcy of American Southern Publishing Company, Inc., under Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C.A. 78j(b)) and Rule 10b-5 (17 C.F.R. 240.10b-5). Jurisdiction is based on 27 of said Act (15 U.S.C.A. 78aa).
 
 
 33
 This matter is now before the court on defendants' motions to dismiss the plaintiff's complaint. Defendants have submitted several different theories in support of their motions to dismiss. For the reasons hereinafter set out, this court is of the opinion that the defendants' motions are well taken and that the cause should be dismissed as to each defendant so moving.
 
 
 34
 The complaint charges that American Southern Publishing Company (hereinafter called American Southern) was induced to issue 412,000 shares of its stock, at the time of its organization, in exchange for assets of Colonial Press, Inc., et al., having a cost or book value of negative value. The allegations include every director and stockholder of the corporation at the time of the transaction complained of as participants in said transaction.
 
 
 35
 The transaction complained of is alleged to have occurred on or about February 6, 1964, at the time of the organization of American Southern. Adjudication of bankruptcy did not take place until April 11, 1967. The proceedings in the Bankruptcy Court were commenced on October 7, 1966. This civil action was not filed until March 27, 1968.
 
 
 36
 While this action was filed within two years of the filing in bankruptcy, on that date, October 7, 1966, any cause of action which accrued on February 6, 1964, was already barred by one year statute of limitation under the provisions of Title 7, 26, Code of Alabama, 1940, Recompiled. Moreover, the allegations of the complaint charge that the transaction complained of was participated in by every stockholder, officer and director of American Southern at the time of the transaction. This establishes conclusively that the transaction was known to American Southern at the time of the transaction. The provisions of Title 7, 42, which extend the statute of limitations in cases of fraud until one year after discovery, therefore, also barred the action before the initiation of the proceeding in bankruptcy.
 
 
 37
 Under these facts this action is not saved by the provisions of Section 11(e) of the Bankruptcy Act as was the case alleged in Hooper v. Mt. States, 282 F.2d 195 (1960), relied upon by the plaintiff, because in this action the statute had run before proceedings under the Bankruptcy Act were commenced. The contrary was true in the Hooper case. There the statute had not run when the bankruptcy action was begun, and Section 11(e) therefore extended the statute for two more years.
 
 
 38
 The question then arises as to whether facts could be alleged by the Trustee which might cure the complaint by averring concealment from subsequent stockholders.
 
 
 39
 Such is not the case here in an action under the Securities Act wherein the Federal courts have exclusive jurisdiction. A subsequent stockholder would have to attack the transaction through a derivative action. However under the provisions of Rule 23.1 of the Federal Rules of Civil Procedure, a stockholder cannot file a derivative action unless he was a stockholder at the time of the transaction complained of. The existence of stockholders who could not file a derivative action could not toll the statute of limitations by any application of Title 7, Section 42.
 
 
 40
 We are thus faced, from the outset, with a situation where the applicable State statutes of limitation had run prior to filing of the bankruptcy action, and the Trustee therein is therefore barred because the corporation was barred.
 
 
 41
 It must be remembered that the jurisdiction of the court here rests solely on the Securities Act. That the facts might suggest possible State court actions by the Trustee, or even a Security Act case by otheres, is irrelevant here. The Trustee here must establish a right to sue under the Securities Act. Any other action could be brought only in State court, or by other parties.
 
 
 42
 Plaintiff relies on Hooper v. Mt. States, supra, to avoid the statute of limitations and to support the standing of the Trustee to maintain this action.
 
 
 43
 This action differs from the Hooper case in many respects. The complaint here does not charge that the actual value of the assets received by American Southern was less than the actual value of the stock issued. The complaint in Hooper clearly made that charge. The complaint here merely talks in terms of book values and costs, not in terms of market value. The Hooper complaint clearly alleged that persons who were not officers or stockholders deceived certain designted agents of the corporation. None of the officers or stockholders were charged as participants in Hooper. The complaint here charges every stockholder, director, and officer of the corporation at the time of the transaction complained of as a participant in the deception. Every possible agent and beneficial owner of American Southern at the time of the transaction is charged as a participant. No one is left to have been deceived.
 
 
 44
 The instant complaint alleges that subsequently authority was obtained to sell stock to other stockholders. If there were material misrepresentations with respect to, or omissions to reveal, material facts concerning the issuance of the 412,000 shares to Colonial Press in connection with any such subsequent sales, if not now also barred, there might be a Security Act case, or cases, in connection therewith. However, any actions that could be brought in connection with these sales to such subsequent stockholders are not within the charges of this complaint, and would be actions of these stockholders, not of the Trustee. The injury would be to the stockholders and not to the corporation. This complaint attacks only the February 6, 1964, issuance of stock to Colonial Press, Inc.
 
 
 45
 The Hooper case, therefore, answers none of the problems with respect to the statute of limitations in this action. There the statute had not run when the bankruptcy proceeding was filed. Here it had. On that distinction plaintiff's reliance on Hooper fails and the motions to dismiss are due to be granted.
 
 
 46
 This the 7th day of October, 1969.
 
 C. W. Allgood UNITED STATES DISTRICT JUDGE
 
 47
 GODBOLD, Circuit Judge (concurring in part and dissenting in part).
 
 
 48
 I agree that the amended complaint, liberally but fairly read, states a 10b-5 claim on behalf of the corporation, assertible by the trustee, because it sufficiently charges a continuing scheme which, from the beginning, was intended to and in fact did operate in the future to deceive and damage the corporation itself and others who predictably would rely, and did rely, upon the bona fides of the issuance of stock to Colonial.
 
 
 49
 I reach that conclusion by what seems to me the proper approach of trying to discern the extent to which the complaint describes fraudulent and deceptive devices of the type that 10b-5 is designed to reach. This approach appears to me preferable to a conceptualistic conclusion that since all those interested in the corporation had knowledge the corporation was not deceived, and therefore it could have no claim. Equally as unsatisfactory is the opposite approach in which the corporation is considered to be an entity fully independent of its shareholders and directors, and, with the corporate veil not pierced to any extent, the entity is viewed as the victim of deception on February 6, 1964, but with no one around to assert its rights.
 
 
 50
 In my opinion a 10b-5 claim on behalf of the corporation matured when, and only when, the scheme became effective in the sense that there occurred sales of stock to public shareholders who were deceived by the acts that had occurred on February 6, 1964, or when the corporation incurred obligations to subsequent creditors who relied on the bona fides of the stock issuance. The corporation became a 'purchaser' of securities within the meaning of 10b-5 on February 6, 1964, Hooper v. Mountain States, 282 F.2d 195 (5th Cir. 1960). But its status as a purchaser does not alone require the conclusion that it was at that time the victim of a deception in the 10b-5 sense.
 
 
 51
 The majority opinion is susceptible of the interpretation that a 10b-5 claim of the corporation could arise prior to, indeed regardless of, any deceptive impact of the scheme upon the gineral public. If that is what is meant, I am not able to agree. As the majority state, the gravamen of a 10b-5 cause of action proscribed by state law, the exchange proscribed by state law, the exchange of overvalued assets for stock of a closely held company, with the consent of all those interested in the company, is a transaction which does not deceive those participants, may never affect anyone other than them, and may not affect even them adversely. In the instant case, however, the continuing scheme, intended to deceive and damage others, is the connecting link to 10b-5, but only when the wrong of February 6, 1964, is changed in character from something that may be either abstract or private into a deceptive device operating upon the public. It is this class of persons, after all, that 10(b) and Rule 10b-5 were promulgated to protect. See, e.g., Herpich v. Wallace, 430 F.2d 792, 806 (5th Cir. 1970); SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 847-848 (2d Cir. 1968). Arguably, impact upon the public-- X and Y, public shareholders, and Z, a relying creditor-- is irrelevant to whether the corporate entity is a victim of deception. Nonetheless, I think the contrary conclusion is warranted. See Pettit v. American Stock Exchange, 217 F.Supp. 21, 27-28 (S.D.N.Y. 1963). The significance of the scheme's public impact is not that the corporation is for the first time deceived but that the continuing misstatements of value which have appeared at all times on its books have changed in character from something significant only to insiders into a deceptive device effectively unleashed upon the public. The risk imposed originally upon the corporation that it might become exposed to the fraud claims of public shareholders and relying creditors becomes the reality of exposure. The inapplicability of 10b-5 prior to this public deception is what requires the majority to pretermit the situations described in its footnote 10.[1]
 
 
 52
 Though not without misgivings, I can accept the conclusion that 10b-5 is implicated when outside shareholders are brought in, or subsequent creditors caused to rely, but I must reject any idea that American Southern's 10b-5 claim was matured by the potentiality on February 6, 1964, or the actuality thereafter, of liability for taxes. What appears to be a very small and innocent nose is a sizeable camel, and already in the tent. Every corporation becomes liable for taxes. Corporate tax liability seems to me substantially unrelated to deception in the securities field. To suggest that American Southern's tax liabilities are relevant for determining if it has a 10b-5 claim invites a general conclusion that a corporation's issuance of securities plus fraudulent misstatements plus the incurrence of tax liabilities generates a 10b-5 cause of action on behalf of the corporation for the misstatements. So significant an expansion in the federal courts' role in the regulation of corporate mismanagement does not seem to me an objective contemplated by the drafters of the statute and the regulation.
 
 
 
 [1]
 In part that section reads:
 'The district courts of the United States, and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder.'
 
 
 [2]
 'It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--
 '(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.'
 
 
 [3]
 'It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
 '(a) to employ any device, scheme, or artifice to defraud,
 '(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 '(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.'
 
 
 [4]
 Attached as an appendix to this opinion
 
 
 [5]
 The statute required that at least twenty percent of the stock be subscribed for before incorporation. Ala.Code Tit. 10, 21(5)
 
 
 [6]
 Required by Alabama Code Tit. 10, 21(5)
 
 
 [7]
 The alleged scheme to defraud would damage the corporation in at least two ways: (1) by depriving it of the assets it would have possessed if it had received par value for the stock issued to Colonial Press; and (2) by exposing it to the risk of liability for taxes and of liabilities to persons extending credit to the corporation or purchasing stock of the corporation in reliance on misrepresentations flowing from the scheme to defraud
 
 
 [8]
 See 1 Collier on Bankruptcy, 14th ed., 2.09
 
 
 [9]
 McCandless, Receiver v. Furlaud, 1935, 296 U.S. 140, 56 S.Ct. 41, 80 L.Ed. 121; Old Dominion Copper Mining & Smelting Co. v. Bigelow, 1909, 203 Mass. 159, 89 N.E. 193, aff'd 1912, 225 U.S. 111, 32 S.Ct. 641, 56 L.Ed. 1009; compare Old Dominion Copper Mining & Smelting Co. v. Lewisohn, 1908, 210 U.S. 206, 28 S.Ct. 634, 52 L.Ed. 1025; see also Pettit v. American Stock Exchange, S.D.N.Y.1963, 217 F.Supp. 21; 1 Fletcher Encyclopedia Corporations, 196, particularly pp. 757 to 762; 18 Am.Jur.2d Corporations, 112, 114, 117; 18 C.J.S. Corporations 129-132
 
 
 [10]
 Thus we need not reach the question whether a claim would be stated under the securities laws if, with no intention of bringing in the general public either as creditors or as shareholders, and with full disclosure to all interested parties, a group of promoters caused a corporation to issue stock. Nor are we confronted with circumstances in which, after a beginning similar to American Southern's, a corporation is operated profitably and then caused to bring in the general public with full and accurate disclosure of the state of its affairs at that time
 
 
 [11]
 Cf., e.g., Azalea Meats, Inc. v. Muscat, 5 Cir. 1967, 386 F.2d 5, 8 (dictum); Aboussie v. Aboussie, 5 Cir. 1971, 441 F.2d 150 (statute of limitations)
 
 
 [1]
 It seems to me that necessarily they must pretermit also the situation in which the scheme is abandoned the day after the stock is issued and no stock is ever placed in the hands of anyone other than the original promoter group and no subsequent creditors are deceived